535 F.2d 830
 Alfred BRAWER, Appellant in no. 75-2003 and Ralph Ignomirello
v.
Jay S. HOROWITZ & Salvatore L. Mauceli (two cases).
Appeal of Ralph J. IGNOMIRELLO, in No. 75-1907.
 Nos. 75-1907, 75-2003.
 United States Court of Appeals,
Third Circuit.
 Submitted Feb. 11, 1976.
Decided May 12, 1976.
 
 Alfred Brawer, pro se.
 Ralph Ignomirello, pro se.
 John J. Barry, Asst. U. S. Atty., Newark, N. J., Jonathan L. Goldstein, U. S. Atty., Maryanne T. Desmond, Asst. U. S. Atty., Newark, N. J., for appellees.
 Before ALDISERT, GIBBONS and ROSENN, Circuit Judges.
 OPINION OF THE COURT
 ALDISERT, Circuit Judge.
 
 
 1
 The question for decision is whether the district court erred in dismissing a complaint that alleged a federal prosecutor and a cooperating witness had conspired to use perjured testimony and to conceal exculpatory evidence in order to convict appellants. The lower court held that both the prosecutor and the witness were immune from civil suit and, therefore, dismissed the complaint for failure to state a claim upon which relief could be granted. We held these appeals pending the Supreme Court's decision in Imbler v. Pachtman, --- U.S. ----, 96 S.Ct. 984, 47 L.Ed.2d 128, 44 U.S.L.W. 4250 (1976). We now affirm.
 
 I.
 
 2
 Appellants Brawer and Ignomirello were tried and convicted in the Southern District of New York of transporting stolen United States Treasury Bills and of conspiring to do so. 18 U.S.C. §§ 2, 371, 2314; see United States v. Brawer, 482 F.2d 117 (2d Cir.), on remand, 367 F.Supp. 156 (S.D.N.Y.1973), aff'd 496 F.2d 703 (2d Cir.), cert. denied, 419 U.S. 1051, 95 S.Ct. 628, 42 L.Ed.2d 646 (1974). Prior to trial, appellee Mauceli pleaded guilty to a charge of conspiring to transport the stolen securities; he testified for the government; after trial, he was sentenced and ultimately placed on probation for two years. 482 F.2d at 121 n. 5. Appellee Horowitz was the prosecuting Assistant U.S. Attorney.
 
 
 3
 In September 1974, after the Second Circuit affirmed their convictions, appellees filed a civil complaint in the District Court for the District of New Jersey. They alleged that Horowitz and Mauceli had conspired with "divers other persons unknown to plaintiffs" "to injure, oppress and procure the convictions of plaintiffs with the knowing use of false and perjured testimony, and to deprive plaintiffs . . . of their rights to a fair and untainted trial secured and guaranteed to them by the due process clause of the Fifth Amendment . . . as well as by the Civil Rights Act, 42 U.S.C.A. §§ 1985(2), 1986."[1] Appellants sought money damages from Mauceli only; they also asked that their convictions be set aside as having been unconstitutionally obtained.
 
 
 4
 Horowitz filed a timely motion to dismiss the complaint for want of personal and subject matter jurisdiction and for failure to state a claim. At the conclusion of an ex parte hearing,[2] the district court found that "at all times relevant to the allegations in the Complaint defendant Jay S. Horowitz was acting in his capacity as Assistant United States Attorney and was immune from suit." Civ.Action No. 74-1448 (D.N.J. Jan. 16, 1975). Accordingly, the court entered summary judgment in the prosecutor's favor. Upon motion and after concluding that appellants might not have had sufficient time in which to respond to Horowitz' motion to dismiss, see Potter v. McCall, 433 F.2d 1087 (9th Cir. 1970) (per curiam), the court vacated its order. Ultimately, however, the court reaffirmed its initial ruling on Horowitz' immunity. Civ.Action No. 74-1448 (D.N.J. June 11, 1975).[3]
 
 
 5
 Meanwhile, Mauceli had failed to answer the complaint timely and defaults were entered against him in December 1974. F.R.Civ.P. 55(a). Appellants then moved the district court to enter a default judgment as to Mauceli. F.R.Civ.P. 55(b). In February 1975, the United States responded on behalf of Mauceli with a motion to dismiss. Appellants moved to disqualify the United States; Mauceli countered with an affidavit, reciting in part that he had never received notice of the motion for a default judgment against him and that, in any event, he had been absent from the country for a short time "arranging my relocation under a new identity, with the assistance of the United States Government." In its June 1975 opinion, the district court held that the United States had legal authority to represent Mauceli,[4] 28 U.S.C. § 517, and that Mauceli's alleged actions were cloaked with "absolute quasi-judicial immunity."
 
 
 6
 Thus, the district court dismissed the complaint as to both defendants with prejudice and without costs. These appeals, timely noticed, followed. We have jurisdiction pursuant to 28 U.S.C. § 1291.
 
 II.
 
 7
 Imbler v. Pachtman, supra, held that a state prosecutor is absolutely immune from a civil suit for damages under 42 U.S.C. § 1983[5] where the allegations of constitutional deprivation relate solely to his initiating a prosecution and presenting the case, i. e., to his role as an advocate. --- U. S. at ----, 96 S.Ct. at 995, 47 L.Ed.2d at 143, 44 U.S.L.W. at 4257. This case is slightly different. Horowitz was a federal prosecutor, so this case is a Bivens -type action,[6] rather than a § 1983 claim. Also, the relief sought against Horowitz was not money damages, but the setting aside of the convictions.[7] Notwithstanding these distinctions, in considering the immunity of Horowitz vel non we properly may look to § 1983 cases.[8] Paton v. La Prade, 524 F.2d 862, 872 (3d Cir. 1975). Accordingly, we focus on Imbler.
 
 
 8
 We have reviewed the policy considerations underlying the immunity accorded in Imbler, --- U.S. at ----, 96 S.Ct. at 990-995, 47 L.Ed.2d 137-143, 44 U.S.L.W. at 4254-56. We believe that different rules should not obtain for federal prosecutors sued on a Bivens theory and for state prosecutors sued under § 1983. The policy considerations are exactly the same in each case. Accordingly, we hold that a federal prosecutor is absolutely immune from suit where the allegations relate solely to his initiating and presenting a criminal case. The allegations of the complaint implicating Horowitz all related to actions in his role as an advocate, rather than as an administrator or investigator. See Imbler, supra, --- U.S. at ----, 96 S.Ct. at 995, 47 L.Ed.2d at 144, 44 U.S.L.W. at 4257 & n.33. Thus, the district court did not err in holding Horowitz immune from this suit and dismissing the complaint as to him for failure to state a claim.
 
 III.
 
 9
 Before considering whether the district court properly dismissed the complaint as to Mauceli, we must determine whether the trial court erred in reaching the issue of Mauceli's immunity. The district court ruled that the United States had legal authority to represent Mauceli's interests. We agree.
 
 
 10
 Appellants' argument is multifaceted. First, they argue that the Department of Justice possesses no statutory or regulatory authority to represent a nongovernment defendant in a civil case. This contention approaches the frivolous. 28 U.S.C. § 517 provides:
 
 
 11
 The Solicitor General, or any officer of the Department of Justice, may be sent by the Attorney General to any State or district in the United States to attend to the interests of the United States in a suit pending in a court of the United States, or in a court of a State, or to attend to any other interest of the United States.
 
 
 12
 The statutory language does not limit representation to any class of cases; the only explicit limitation is that the interests of the United States be at stake. Judge Friendly summarized the law under the predecessor[9] statute to § 517:
 
 
 13
 Appellants claim in the first instance that the suggestion was unauthorized since the United States has no financial interest in the litigation. But the statute, 5 U.S.C. § 316, is not limited by its terms to cases of financial interest; it authorizes the Attorney General to send any officer of the Department of Justice "to attend to the interests of the United States in any suit pending in any of the courts of the United States, or in the courts of any State * * *." Long before the present statute, which derives from the Act of June 22, 1870, c. 150, § 5, 16 Stat. 162, the Attorney General had submitted suggestions as to the immunity of the property of foreign sovereigns, The Schooner Exchange v. M'Faddon, 7 Cranch 116, 147, 11 U.S. 116, 147, 3 L.Ed. 287 (1812), as he has frequently done thereafter. Yet "the interests of the United States" in such cases are simply its interests in friendly intercourse with other nations and in avoiding reprisals by them . . . .[5]
 
 
 14
 5. For other types of suggestions of interest in behalf of the Department of State, see Clark v. Allen, 331 U.S. 503, 67 S.Ct. 1431, 91 L.Ed. 1633 (1947); Ivancevic v. Artukovic, 211 F.2d 565, 566, fn. 4 (9 Cir.), cert. denied, 348 U.S. 818, 75 S.Ct. 28, 99 L.Ed. 698 (1954); Pierre v. Eastern Air Lines, Inc., 152 F.Supp. 486 (D.N.J.1957); Note, Federal Intervention in Private Actions Involving the Public Interest, 65 Harv.L.Rev. 319 (1951); Bilder, The Office of the Legal Adviser, 56 Am.J.Int'l Law 633, 676-78 (1962).
 
 
 15
 International Products Corp. v. Koons, 325 F.2d 403, 408 (2d Cir. 1963). See also Booth v. Fletcher, 69 U.S.App.D.C. 351, 101 F.2d 676, 681-82 (D.C.Cir.1938), cert. denied, 307 U.S. 628, 59 S.Ct. 835, 83 L.Ed. 1511 (1939).
 
 
 16
 Next, appellants contend that 28 U.S.C. § 518(b), which authorizes the Attorney General to dispatch someone to "conduct and argue any case in a court of the United States in which the United States is interested",[10] requires as a prerequisite to government representation a specific authorization from the Attorney General. Because the government relied on a bald assertion that the Attorney General had determined that the interests of the United States were involved, the argument continues, the district court erred in denying appellants' motion to disqualify the government from representing Mauceli. We find absolutely no support in § 517 or § 518 for appellants' proposition. Moreover, 28 U.S.C. § 515[11] part of the same Chapter, and recodified at the same time as § 517 and § 518 does require an explicit direction by the Attorney General. Had Congress intended to require a specific authorization from the Attorney General before the government entered a case to protect the interests of the United States, it would have been a simple task to incorporate language similar to that which appears in § 515 into § 517 or § 518.
 
 
 17
 Thus, the proper focus on this appeal must be on whether the "interests of the United States" were at stake in the damage action against Mauceli.[12] The government should not "interfere in any mere matter of private controversy". In re Debs, 158 U.S. 564, 586, 15 S.Ct. 900, 907, 39 L.Ed. 1092, 1103 (1895). On the other hand, it plays a legitimate role where the matters involved "affect the public at large" and "are entrusted to the care of the nation". Ibid.
 
 
 18
 Clearly, the government has an interest in the effective enforcement of its criminal laws. See Roviaro v. United States, 353 U.S. 53, 59, 77 S.Ct. 623, 627, 1 L.Ed.2d 639, 644 (1957). In many instances of sophisticated criminal activity, effective prosecution is impossible absent the cooperation of an "insider". Frequently, too, the only carrot the government can offer such an informer is the promise of a new identity.
 
 
 19
 Here, Mauceli cooperated with the government in obtaining the convictions of appellants for trafficking in stolen Treasury bills. In return, the government relocated him and gave him a new identity. See page ---- supra. The government responded to the motion to disqualify it by asserting:
 
 
 20
 The "interest of the United States" involved here is the assistance and protection of government informers and witnesses, so valuable in the prosecution of criminal actions. Public policy demands that government informers and witnesses should feel free to give complete and independent testimony in criminal prosecutions, unintimidated by the threat of harassing, vexatious and frivolous civil suits against them due to their testimony.
 
 
 21
 Moreover, Mauceli opined in his affidavit that the damage action was instituted "for the illicit, illegal purpose of obtaining my new identity in order to seek revenge upon me by the use of physical violence."
 
 
 22
 In these circumstances, we agree that the interests of the United States were involved. A contrary holding would deny the reality of the "justice system" that exists among some criminals and would tend to subvert an important aspect of the government's work for the "public interest in effective law enforcement." Roviaro v. United States, supra, 353 U.S. at 59, 77 S.Ct. at 627, 1 L.Ed.2d at 644.
 
 IV.
 
 23
 We may now consider Mauceli's amenability to appellants' claims.
 
 A.
 
 24
 Assuming arguendo that a Bivens action would lie against a witness at a federal trial,[13] we may proceed along a path analogous to that travelled by the Supreme Court in Imbler. Specifically, we inquire into the immunity historically accorded witnesses at common law and the interests behind it, Imbler v. Pachtman, supra, --- U.S. at ----, 96 S.Ct. at 990, 47 L.Ed.2d at 137, 44 U.S.L.W. at 4254; then we must determine whether the considerations of public policy underlying the common-law rule likewise countenance immunity from a Bivens claim, ibid. at ----, 96 S.Ct. at 992, 47 L.Ed.2d at 140, 44 U.S.L.W. at 4255.
 
 
 25
 Common-law witness immunity extends back to Lord Mansfield's comprehensive 1772 formula: "Neither party, witness, counsel, jury, nor judge can be put to answer, civilly or criminally for words spoken in office." See Veeder, Absolute Immunity in Defamation: Judicial Proceedings, 9 Colum.L.Rev. 463, 474 (1909). While on the New York Court of Appeals, Cardozo embraced Lord Mansfield's formulation; Augustus Hand described it as "practically the universal rule in this country." See Sacks v. Stecker, 60 F.2d 73, 75 (2d Cir. 1932). See generally 1 F. Harper & F. James, The Law of Torts § 5.22, at 423-26 (1956) (hereinafter cited as Harper & James). Witness immunity is firmly bottomed in public policy:
 
 
 26
 The function of witnesses is fundamental to the administration of justice. The court's judgment is based on their testimony and they are given every encouragement to make a full disclosure of all pertinent information within their knowledge. They are, of course, subject to the control of the trial judge and are subject to contempt citation for misbehavior in the exercise of the privilege and to prosecution for perjury if convicted of knowingly giving false testimony.
 
 
 27
 Ibid. at 424. See also Veeder, Absolute Immunity in Defamation: Judicial Proceedings, 9 Colum.L.Rev. at 476: "(E)very consideration of public policy requires that they should be as fearless in testifying as the judge and jury are independent in weighing their testimony."
 
 
 28
 The policy arguments supporting common-law witness immunity obtain equally to immunize a single witness from a Bivens -type action. Indeed, where as here the gist of the complaint is that perjured testimony deprived appellants of their constitutional right to a fair trial, the claim boils down to one of "constitutional defamation".
 
 
 29
 Immunity from a civil damage suit, however, does not mean that a cooperating witness in a criminal trial can speak with complete impunity of his former cohorts. The trial judge may exclude inflammatory testimony. See Harper & James at 426. On cross-examination, counsel may seek to undermine the witness' credibility. Even if it develops only later that the witness committed perjury, and notwithstanding Lord Mansfield's statement to the contrary, the witness may be indicted and convicted of perjury. See Imbler v. Pachtman, supra, --- U.S. at ----, 96 S.Ct. at 998, 47 L.Ed.2d at 147,44 U.S.L.W. at 4259 (White, J., concurring in judgment).
 
 B.
 
 30
 Next, we address the complaint's allegation that the prosecutor and the witness had conspired to use perjured testimony and to conceal exculpatory evidence in order to deprive appellants of a fair trial. These allegations, appellants contended, sufficed to state a claim under 42 U.S.C. § 1985(2).[14]
 
 
 31
 We approach the perfidious syntax of § 1985(2) with some reserve for, as the First Circuit recently observed, there is a dearth of authority to light our way. Hahn v. Sargent, 523 F.2d 461, 469 (1st Cir. 1975), cert. denied, --- U.S. ----, 96 S.Ct. 1495, 47 L.Ed.2d 754, 44 U.S.L.W. 3545 (Mar. 29, 1976).
 
 
 32
 Section 1985(2) derives from § 2 of the Ku Klux Act. Act of April 20, 1871, ch. 22, § 2, 17 Stat. 13.[15] Its current language is taken verbatim from Revised Statutes § 1980, Second. Comparison of the 1871 Act and the 1875 "revision" under Secretary of State Hamilton Fish reveals no substantive change in the statutory schema.[16] The formulation of R.S. § 1980 merely reorganized[17] the Act into its current three subsections and made minor grammatical changes.
 
 
 33
 Section 1985(2) clearly reaches private action. See Griffin v. Breckenridge, 403 U.S. 88, 96-101, 91 S.Ct. 1790, 1795-1797, 29 L.Ed.2d 338, 344-347 (1971). In this respect, it differs markedly from 42 U.S.C. § 1983, which derives from § 1 of the Ku Klux Act. Another important difference between the two sections is that § 1985 proscribes conspiracies, while § 1983 provides a civil remedy for specific acts of constitutional deprivation. See 1 Statutory History of the United States: Civil Rights 626 (B. Schwartz ed. 1970) (hereinafter cited as Schwartz). "That the statute was meant to reach private action does not, however, mean that it was intended to apply to all tortious, conspiratorial interferences with the rights of others." Griffin v. Breckenridge, supra, 403 U.S. at 101, 91 S.Ct. at 1798, 29 L.Ed.2d at 348 (discussing § 1985(3)). To avoid the "constitutional shoals" attendant an impermissibly overbroad statutory interpretation, see ibid. at 102, 91 S.Ct. at 1798, 29 L.Ed.2d at 348, therefore, we must look to the specific conspiracies proscribed by Congress.
 
 
 34
 The debates on the Ku Klux Act as they relate to what is now § 1985(2) bespeak a Congressional intent to insulate witnesses, parties and grand or petit jurors from conspiracies to pressure or intimidate them in the performance of their duties, and an intent to guard against conspiracies the object of which is to deny citizens the equal protection of the laws. See Schwartz 621-24, 641-43. See also C. Antieau, Federal Civil Rights Acts: Civil Practice § 95 (1971). Senator George Edmunds of Vermont, who reported the bill out of committee, elaborated on this second objective in the following exchange:
 
 
 35
 OLIVER MORTON (R. Ind.). I ask the Senator whether, in the seventh and eight lines of that section where the words "or obstruct the equal and impartial course of justice" are used, that clause is intended to embrace the State courts.
 
 
 36
 MR. EDMUNDS. Certainly, referring to "the equal and impartial course of justice" mentioned in the second sentence on the third page. This obstruction of the equal and impartial course of justice, however, must, under the provisions of all this bill, go so far as to deny and withhold from citizens of the United States that equality of protection in seeking justice which the Constitution of the United States gives to them. We do not undertake in this bill to interfere with what might be called a private conspiracy growing out of a neighborhood feud of one man or set of men against another to prevent one getting an indictment in the State courts against men for burning down his barn; but, if in a case like this, it should appear that this conspiracy was formed against this man because he was a Democrat, if you please, or because he was a Catholic, or because he was a Methodist, or because he was a Vermonter, (which is a pretty painful instance that I have in my mind in the State of Florida within a few days where a man lost his life for that reason,) then this section could reach it.
 
 Schwartz 623 (emphasis added).[18]
 
 37
 After considering the statutory language and the apparent Congressional intent evidenced in the legislative history, we conclude with the First Circuit that § 1985(2) itself subdivides into two parts that which precedes and that which follows the semicolon. See n.1 supra ; Hahn v. Sargent, supra, 523 F.2d at 469.
 
 
 38
 The latter half of the subsection guards against those obstructions of justice "in any State or Territory" which have as their objects the denial of the equal protection of the laws. The complaint in the instant case[19] does not allege a "class-based, invidiously discriminatory animus". Ibid. See also Griffin v. Breckenridge, supra, 403 U.S. at 96-103, 91 S.Ct. at 1795-1798, 29 L.Ed.2d at 344-348. Accordingly, the complaint failed to state a claim under the second half of § 1985(2). Were this a case alleging a conspiracy to testify falsely, or to suppress exculpatory information, in order to effect a class-based, invidious discrimination, it would present wholly different issues and might state a claim for relief.
 
 
 39
 The first half of § 1985(2) aims at conspiracies the object of which is intimidation of or retaliation against parties or witnesses, or grand or petit jurors, in any court of the United States. The federal nexus, then, is not the class-based, invidiously discriminatory animus required by the second half of the subsection, but the connection of the proscribed activities to a federal court. Viewing the statute in this light and assuming appellants would seek to invoke this part, but see n.19 supra, the thrust of their argument must be that Horowitz and Mauceli "conspire(d) to . . . influence the verdict . . . or indictment of (the) grand or petit juror(s)" by agreeing to use perjured testimony and to conceal exculpatory evidence. After careful consideration we have concluded that such a construction would be impermissibly generous. We understand the first part of § 1985(2) to concern itself with conspiratorial conduct that directly affects or seeks to affect parties, witnesses or grand or petit jurors. The allegations of this complaint are different in kind. At best, the allegation is that the conspiracy "influenced" the jurors by precluding them from considering fully accurate evidence. We deem this "influence" to be too remote to fit within the intended ambit of § 1985(2).
 
 
 40
 The very language of the Ku Klux Act, see n.15 supra, buttresses us in our conclusion, for the statute specified that conspiracies to influence juries be "by force, intimidation, or threat". This approach was wholly consistent with each of the preceding clauses of § 2 of the 1871 Act. Although with respect to conspiracies to influence jurors the current § 1985(2) does not include these five words, we attach no talismanic significance to this difference. Rather, we believe it wholly logical and reasonable that, in compiling the Revised Statutes, Secretary Fish's commission deleted the words, recognizing that juries can be "influenced" as often and perhaps more effectively by positive inducements such as money as they can by negative inducements, including force, intimidation or threats. In our view, the deletion was not substantive, see n.16 supra, but sought to clarify the Congressional intent to reach all conspiracies to influence jurors directly.
 
 
 41
 Thus, we conclude that appellants failed to state a claim under § 1985(2).
 
 C.
 
 42
 Having failed to state a claim under § 1985(2), a fortiori appellants failed to state a claim under § 1986. Hahn v. Sargent, supra, 523 F.2d at 469-70; Hamilton v. Chaffin, 506 F.2d 904, 914 (5th Cir. 1975).
 
 V.
 
 43
 To summarize, we conclude that Horowitz was absolutely immune from appellants' allegations; that the public interest in full disclosure at trial of all relevant information tips the balance in favor of preserving to a single witness immunity from a Bivens action for damages; and that in these circumstances appellants failed to state a claim against Mauceli under either § 1985(2) or § 1986.[20]
 
 
 44
 The judgment of the district court will be affirmed.[21]
 
 
 
 [1]
 42 U.S.C. § 1985(2) provides:
 If two or more persons in any State or Territory conspire to deter, by force, intimidation, or threat, any party or witness in any court of the United States from attending such court, or from testifying to any matter pending therein, freely, fully, and truthfully, or to injure such party or witness in his person or property on account of his having so attended or testified, or to influence the verdict, presentment, or indictment of any grand or petit juror in any such court, or to injure such juror in his person or property on account of any verdict, presentment, or indictment lawfully assented to by him, or of his being or having been such juror; or if two or more persons conspire for the purpose of impeding, hindering, obstructing, or defeating, in any manner, the due course of justice in any State or Territory, with intent to deny to any citizen the equal protection of the laws, or to injure him or his property for lawfully enforcing, or attempting to enforce, the right of any person, or class of persons, to the equal protection of the laws
 an action for damages will lie. 42 U.S.C. § 1986 provides:
 Every person who, having knowledge that any of the wrongs conspired to be done, and mentioned in section 1985 of this title, are about to be committed, and having power to prevent or aid in preventing the commission of the same, neglects or refuses so to do, if such wrongful act be committed, shall be liable to the party injured, or his legal representatives, for all damages caused by such wrongful act, which such person by reasonable diligence could have prevented; and such damages may be recovered in an action on the case; and any number of persons guilty of such wrongful neglect or refusal may be joined as defendants in the action; and if the death of any party be caused by any such wrongful act and neglect, the legal representatives of the deceased shall have such action therefor, and may recover not exceeding $5,000 damages therein, for the benefit of the widow of the deceased, if there be one, and if there be no widow, then for the benefit of the next of kin of the deceased. But no action under the provisions of this section shall be sustained which is not commenced within one year after the cause of action has accrued.
 Jurisdiction in the district court was predicated upon 28 U.S.C. §§ 1331(a), 1343.
 
 
 [2]
 Appellants were both serving prison terms at the time. Recognizing that it was without power to set aside the convictions as requested, the court deemed itself limited to consideration of the damage claim. Accordingly, it viewed 18 U.S.C § 3006A(g) as inapplicable and declined to appoint counsel as an exercise of discretion pursuant to 28 U.S.C. § 1915. Civ.Action No. 74-1448 (D.N.J. Apr. 22, 1975). The court also denied motions for habeas corpus ad testificandum because the issues to be resolved were legal, not factual, and thus did not require the taking of testimony. Appellants do not contest these rulings
 
 
 [3]
 The district court considered the matters on the basis of written submissions received. See F.R.Civ.P. 78
 
 
 [4]
 In the alternative, the court concluded that it could recognize the failure to state a claim sua sponte. Because of the view we take, infra, we need not and do not address this ruling
 
 
 [5]
 42 U.S.C. § 1983 provides:
 Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.
 
 
 [6]
 Bivens v. Six Unknown Named Federal Narcotics Agents, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971)
 
 
 [7]
 We share the district court's concern that Horowitz was powerless to obey any injunction mandating the relief sought
 
 
 [8]
 "(A) Bivens -type cause of action is the federal counterpart to claims under 42 U.S.C. § 1983 . . . ." Paton v. La Prade, 524 F.2d 862, 871 (3d Cir. 1975)
 
 
 [9]
 5 U.S.C. § 316, the predecessor statute, was recodified without substantive change. Act of Sept. 6, 1966, Pub.L.No.89-554, § 4(c), 80 Stat. 613
 
 
 [10]
 In its entirety, 28 U.S.C. § 518 provides:
 (a) Except when the Attorney General in a particular case directs otherwise, the Attorney General and the Solicitor General shall conduct and argue suits and appeals in the Supreme Court and suits in the Court of Claims in which the United States is interested.
 (b) When the Attorney General considers it in the interests of the United States, he may personally conduct and argue any case in a court of the United States in which the United States is interested, or he may direct the Solicitor General or any officer of the Department of Justice to do so.
 
 
 [11]
 28 U.S.C. § 515(a) provides:
 The Attorney General or any other officer of the Department of Justice, or any attorney specially appointed by the Attorney General under law, may, when specifically directed by the Attorney General, conduct any kind of legal proceeding, civil or criminal, including grand jury proceedings and proceedings before committing magistrates, which United States attorneys are authorized by law to conduct, whether or not he is a resident of the district in which the proceeding is brought.
 (Emphasis added.)
 
 
 [12]
 Appellants also argue that the government's appearance for Mauceli constituted a conflict of interest, caused a waiver of all defenses, was untimely, and put them at an unfair advantage. We deem these objections to be without merit
 
 
 [13]
 The proposition is not self-evident. The Bivens action is the federal cognate of the § 1983 action. See n.8 supra. Section 1983 requires that the defendant have acted under color of state law. Bivens was predicated on the perceived need to forge a federal remedy for Fourth Amendment deprivations by federal officials. See Bivens v. Six Unknown Named Federal Narcotics Agents, supra, 403 U.S. at 392-97, 91 S.Ct. at 2002-2005, 29 L.Ed.2d at 624-627. As Justice Harlan wrote, the interest which Bivens claimed was "to be free from official conduct in contravention of the Fourth Amendment." Ibid. at 400, 91 S.Ct. at 2006, 29 L.Ed.2d at 628 (Harlan, J., concurring) (emphasis added). Several courts have concluded that a witness testifying in state court does not act under color of state law for purposes of § 1983. Stambler v. Dillon, 302 F.Supp. 1250, 1255 (S.D.N.Y.1969); Pritt v. Johnson, 264 F.Supp. 167, 170 (M.D.Pa.1967); Smith v. Jennings, 148 F.Supp. 641 (W.D.Mich.1957). Similarly, one could argue that a witness at a federal trial is not amenable to a Bivens -type action
 
 
 [14]
 The government states that appellants no longer pursue any claim under the Civil Rights Act. Appellees' Brief at 4 n.1. In support of this contention, the government cites to the following statement in appellants' brief: "Additional jurisdiction was based upon the provisions of the Civil Rights Act, which appellants do not assert on appeal." Appellants' Brief at 4. Appellants' statement arguably could be interpreted as relating solely to the district court's subject matter jurisdiction. These appeals were prosecuted pro se from a dismissal of the entire complaint with prejudice. Accordingly, we deem the Civil Rights Act claims as properly before us. See Haines v. Kerner, 404 U.S. 519, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972) (per curiam); Grant v. Hogan, 505 F.2d 1220, 1225 (3d Cir. 1974)
 
 
 [15]
 Sec. 2. That if two or more persons within any State or Territory of the United States shall conspire together to overthrow, or to put down, or to destroy by force the government of the United States, or to levy war against the United States, or to oppose by force the authority of the government of the United States, or by force, intimidation, or threat to prevent, hinder, or delay the execution of any law of the United States, or by force to seize, take, or possess any property of the United States contrary to the authority thereof, or by force, intimidation, or threat to prevent any person from accepting or holding any office or trust or place of confidence under the United States, or from discharging the duties thereof, or by force, intimidation, or threat to induce any officer of the United States to leave any State, district, or place where his duties as such officer might lawfully be performed, or to injure him in his person or property on account of his lawful discharge of the duties of his office, or to injure his person while engaged in the lawful discharge of the duties of his office, or to injure his property so as to molest, interrupt, hinder, or impede him in the discharge of his official duty, or by force, intimidation, or threat to deter any party or witness in any court of the United States from attending such court, or from testifying in any matter pending in such court fully, freely, and truthfully, or to injure any such party or witness in his person or property on account of his having so attended or testified, or by force, intimidation, or threat to influence the verdict, presentment, or indictment, of any juror or grand juror in any court of the United States, or to injure such juror in his person or property on account of any verdict, presentment, or indictment lawfully assented to by him, or an account of his being or having been such juror, or shall conspire together, or go in disguise upon the public highway or upon the premises of another for the purpose, either directly or indirectly, of depriving any person or any class of persons of the equal protection of the laws, or of equal privileges or immunities under the laws, or for the purpose of preventing or hindering the constituted authorities of any State from giving or securing to all persons within such State the equal protection of the laws, or shall conspire together for the purpose of in any manner, impeding, hindering, obstructing, or defeating the due course of justice in any State or Territory, with intent to deny to any citizen of the United States the due and equal protection of the laws, or to injure any person in his person or his property for lawfully enforcing the right of any person or class of persons to the equal protection of the laws, or by force, intimidation, or threat to prevent any citizen of the United States lawfully entitled to vote from giving his support or advocacy in a lawful manner towards or in favor of the election of any lawfully qualified person as an elector of President or Vice-President of the United States, or as a member of the Congress of the United States, or to injure any such citizen in his person or property on account of such support or advocacy each and every person so offending shall be deemed guilty of a high crime, and, upon conviction thereof in any district or circuit court of the United States or district or supreme court of any Territory of the United States having jurisdiction of similar offences, shall be punished by a fine not less than five hundred nor more than five thousand dollars, or by imprisonment, with or without hard labor, as the court may determine, for a period of not less than six months nor more than six years, as the court may determine, or by both such fine and imprisonment as the court shall determine. And if any one or more persons engaged in any such conspiracy shall do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby any person shall be injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the persons so injured or deprived of such rights and privileges may have and maintain an action for the recovery of damages occasioned by such injury or deprivation of rights and privileges against any one or more of the persons engaged in such conspiracy, such action to be prosecuted in the proper district or circuit court of the United States, with and subject to the same rights of appeal, review upon error, and other remedies provided in like cases in such courts under the provisions of the act of April ninth, eighteen hundred and sixty-six, entitled "An act to protect all persons in the United States in their civil rights, and to furnish the means of their vindication."
 (Emphasis added.)
 
 
 [16]
 By the Act of June 20, 1874, § 2, Congress charged Secretary of State Hamilton Fish with the duty of preparing for publication and distribution the Revised Statutes of the United States. 18 Stat. 113-14, This work, according to its title page, embraced the statutes of the United States, general and permanent in their nature, in force on Dec. 1, 1873, as revised and consolidated by commissioners appointed under an act of Congress. Congress "enacted" the Revised Statutes on June 22, 1874; Secretary Fish affixed his seal to the finished work on February 22, 1875. Thus, it could hardly be argued that Congress gave Secretary Fish a carte blanche right of amendment
 
 
 [17]
 To appreciate the nature of the reorganization, compare the text of § 1985(2), as set forth at n.1 supra, with the italicized portion of n.15 supra. Also note that the clause of the Ku Klux Act separating the two principal italicized portions in n.15 supra became the first part of what is now § 1985(3)
 
 
 [18]
 See also the remarks of Representative Ellis H. Roberts describing the factors that gave rise to the legislation:
 Three facts combine to show the necessity for a bill substantially like that now under consideration. First, the violence and lawlessness, for which it is proposed to provide a remedy, occur in many widely separated districts; second, the character of the victims selected and the methods of outrage, indicate a common source and purpose, an organized conspiracy; and, third, the organization to which they are traced is political in its origin and aims, and is military in form.
 But one rule never fails: the victims whose property is destroyed, whose persons are mutilated, whose lives are sacrificed, are always Republicans. They may be black or white; they include those who wore the blue and those who wore the gray; new-comers and life-long residents, but only Republicans. Stain the door lintels with the mark of opposition to reconstruction and of hostility to the national Administration, and the destroying angel passes by. Omit that sign, and the torch may kindle the roof that covers women and children; the scourge may fall upon shoulders that stoop with weakness and with age; the bullet may pierce the breast without warning. Such uniformity of result can come only from design. Republicans only are beaten and mutilated and murdered, because the blows are aimed at Republicans only.
 Cong.Globe, 42d Cong., 1st Sess. 412-13 (1871).
 
 
 [19]
 Appellants appear to have attempted to come within the purview of the second part of § 1985(2), for they alleged that defendants "acted to impede, hinder and obstruct the due course of justice and with the intent to deprive plaintiffs of a fair and untainted trial and appeal, as guaranteed them under the due process clause of the United States Constitution and § 1985(2) of Title 42, U.S.C.A."
 
 
 [20]
 We recognize the possibility of an anomaly: conceptually a claim may lie against a witness for conspiring to impede justice with the intent of denying equal protection, see Part IV B supra, but not for the overt act of testifying, see Part IV A supra. As Lord Diplock declared in his dissent from Knuller v. D.P.P., (1972) 2 All E.R. 898, 921, "it is the height of sophistry to say that the doing of acts in concert which alone can have harmful consequences is not what the law regards as meriting punishment, but that the prior agreement to do them is." Such, however, is the nature of the statutory animal which is § 1985(2). Schwartz 626
 
 
 [21]
 We may affirm a correct result even though our reasoning be different from that of the district court. E. g., Rhoads v. Ford Motor Co., 514 F.2d 931, 934 (3d Cir. 1975)