Johnny J. DOTSON and Daniel F.
Bloch, Plaintiffs,

v.

The MOUNTAIN MISSION SCHOOL,
INC., et al., Defendants.

Civ. A. No. 79–0125–B.

United States District Court,
W.D. Virginia,
Big Stone Gap Division.

June 21, 1984.

Johnny J. Dotson and Daniel F. Bloch pro se.

Linwood T. Wells, Asst. Atty. Gen., Richmond, Va., E.K. Street, Grundy, Va., Birg E. Sergent, Pennington Gap, Va., Wade Massie, Abingdon, Va., L.T. Haynes, Roanoke, Va., for defendants.

## MEMORANDUM OPINION

GLEN M. WILLIAMS, District Judge.

On January 26, 1974, James M. Swiney appeared before Carl Boyd, a justice of the peace of Buchanan County, Virginia, and under oath, accused the plaintiff Bloch of abducting Robert Watts, an infant of the age of thirteen years, from The Mountain Mission School, Grundy, Virginia. On May 29, 1975, Bloch was indicted by a grand jury and entered a plea of guilty to the charge of abduction. Bloch subsequently filed a petition for a writ of habeas corpus in this court: Because of the petitioner's failure to exhaust state remedies, the court dismissed the petition on September 19, 1979. He then filed a petition for a writ of habeas corpus before the Supreme Court of Appeals of Virginia which, in turn, denied the petition. Bloch again filed a habeas corpus petition in this court, and again this court denied his petition on April 1, 1982; *Bloch v. Grissom, et al.,* Civil Action Number 81–0217–B (Western District of Virginia). The United States Circuit Court of Appeals for the Fourth Circuit upheld the decision by an Order entered on September 30, 1982; *Bloch v. Grissom, et al.,* 691 F.2d 492 (4th Cir.1982).

Based on Bloch's own admissions, the underlying facts leading up to Bloch's arrest on the foregoing charges are that prior to these events, he had been charged with sexual molestation of minor boys (whose ages ranged from eleven to thirteen years) in Dayton, Ohio, in Ross County, Ohio, and in Clearwater, Florida. At the time the children were taken from The Mountain Mission School, Bloch approached the boys from under a porch as they were returning from breakfast to the boys' dormitory at about 7:15 a.m. It was dark and raining. After talking to the boys, he took them from Virginia to Beckley, West Virginia, in a rented car. From that point, he put them in his own airplane and transported them to Clearwater, Florida. Subsequently, Bloch was arrested with the two boys under both Federal and state warrants and taken before United States Magistrate Roger J. Makeley in Ohio who then returned the custody of the children back to The Mountain Mission School and returned Bloch to Virginia for trial. After serving four months of a ten-year sentence, Bloch has devoted his time to filing suits in his own behalf and on behalf of other children at The Mountain Mission School against the School and anyone connected with his arrests, trial, and conviction in Buchanan County, Virginia.

Bloch contends that Judge Persin conspired with Mr. Sublett, President of The Mountain Mission School, to intimidate him from testifying in state court proceedings in California and in Ohio; that defendant Williams, Commonwealth's Attorney of Buchanan County, Virginia, conspired with Mr. Sublett to send one Edith Justus to Ohio to murder him; that defendant McGlothlin, a member of the Virginia Legislature, conspired with Williams and Sublett to frame him in his trial in Buchanan County, Virginia; that defendant Osborne conspired with Sublett to have the plaintiff assaulted in jail by prisoners; that his two attorneys, Sawyer and Sergent, who were employed by him, obstructed justice and hindered him from testifying freely, fully and truthfully in court; and that Roger J. Makeley denied his constitutional rights to the full faith and credit of court orders guaranteed by Article IV of the United States Constitution by intimidating Robert

Watts and Johnny Dotson from testifying freely, fully and truthfully. He alleges that The Mountain Mission School was an orphanage and that children were illegally abused and that he has been the subject of harm by the defendants in an effort to cover up the abuses. He specifically alleges that Dr. McDonald and the defendants Sublett and Swiney are abusing the children at the School.

This suit was brought against The Mountain Mission School and forty-two individuals, including officials of the United States, Virginia, Ohio, and Florida. This original suit contained allegations seeking a writ of mandamus, an injunction under the freedom of information act, habeas corpus relief, declaration of unconstitutionality of Virginia laws pertaining to child care institutions, and conspiracy, pursuant to 42 U.S.C. § 1985.

In a decision dated October 18, 1982, the United States Court of Appeals for the Fourth Circuit, 692 F.2d 752, dismissed all of the complaints of the plaintiffs except that the court stated "[g]iven that pro se pleadings must be read liberally, we think that the plaintiffs must be afforded the opportunity to decide a claim under both halves of Section 1985(2) and under Section 1985(3) on remand in the District Court."

This case has been the subject of extensive discovery and is replete with affidavits and counteraffidavits. All parties have now moved the court for summary judgment assessing various reasons. The court now turns its attention to the legal and factual issues presented by these motions for summary judgment.

## THE LAW AND THE RULINGS OF THE COURT

■ The purpose of the statutory provision now codified as § 1985 of Title 42 of the United States Code [1] and originally en-

---

1. Section 1985 of Title 42 of the United States Code states (with emphasis added):

(1) If two or more persons in any State or Territory conspire to prevent, by force, intimidation, or threat, any person from accepting or holding any office, trust, or place of confidence under the United States, or from discharging any duties thereof; or to induce by like means any officer of the United States to leave any State, district, or place, where his duties as an officer are required to be performed, or to injure him in his person or property on account of his lawful discharge of the duties of his office, or while engaged in the lawful discharge thereof, or to injure his property so as to molest, interrupt, hinder, or impede him in the discharge of his official duties;

(2) If two or more persons in any State or Territory conspire to deter, by force, intimidation, or threat, any party or witness in any court of the United States from attending such court, or from testifying to any matter pending therein, freely, fully, and truthfully, or to injure such party or witness in his person or property on account of his having so attended or testified, or to influence the verdict, presentment, or indictment of any grand or petit juror in any such court, or to injure such juror in his person or property on account of any verdict, presentment, or indictment lawfully assented to by him, or of his being or having been such juror; *or if two or more persons conspire for the purpose of impeding, hindering, obstructing, or defeating, in any*

*manner, the due course of justice in any State or Territory, with intent to deny to any citizen the equal protection of the laws, or to injure him or his property for lawfully enforcing, or attempting to enforce, the right of any person, or class of persons, to the equal protection of the laws;*

*(3) If two or more persons in any State or Territory conspire or go in disguise on the highway or on the premises of another, for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; or for the purpose of preventing or hindering the constituted authorities of any State or Territory from giving or securing to all persons within such State or Territory the equal protection of the laws;* or if two or more persons conspire to prevent by force, intimidation, or threat, any citizen who is lawfully entitled to vote, from giving his support or advocacy in a legal manner, toward or in favor of the election of any lawfully qualified person as an elector for President or Vice President, or as a Member of Congress of the United States; or to injure any citizen in person or property on account of such support or advocacy; in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so in-

acted as § 2 of the Civil Rights Act of 1871, 17 Stat. 13 (and known as the Ku Klux Klan Act) was to outlaw five broad classes of conspiratorial activity. More specifically, § 1985(1), the first part of § 1985(2), and the second part of § 1985(3) proscribe conspiracies that interfere with and are related to institutions and processes of the federal government:

> The statutory provisions dealing with these categories of conspiratorial activity contain no language requiring that the conspirators act with the intent to deprive their victims of the equal protection of the laws.

*Kush v. Rutledge,* 460 U.S. 719, 724–25, 103 S.Ct. 1483, 1487, 75 L.Ed.2d 413, 418 (1983).

On the other hand, the second part of § 1985(2) and the first part of § 1985(3) proscribe conspiracies that institutionally are not related to federal interests and usually are of primary state concerns:

> Each of these portions of the statute contains language requiring that the conspirators' actions be motivated by an intent to deprive their victims of the equal protection of the laws.

460 U.S. at 725, 103 S.Ct. at 1487.

The United States Supreme Court adopted the "accurate [] and persuasive []" discussion of the legislative history of the Ku Klux Klan Act of 1871 presented in *McCord v. Bailey,* 636 F.2d 606, 615–617 (D.C.Cir.1980), *cert. denied,* 451 U.S. 983, 101 S.Ct. 2314, 68 L.Ed.2d 839 (1981). *Kush,* 460 U.S. at 727, n. 10, 103 S.Ct. at 1488 n. 10. Thus, the Court's opinion re-

solved the previous controversy among the circuits concerning the construction of § 1985(2).[2] *Compare Rutledge v. Arizona Board of Regents,* 660 F.2d 1345, 1454–1455 (9th Cir.1981) (class-based, invidious discrimination is not required under the first part of § 1985(2)), *aff'd sub nom. Kush v. Rutledge,* 460 U.S. 719, 103 S.Ct. 1483, 74 L.Ed.2d 413 (1983), *McCord v. Bailey,* 636 F.2d at 614–617 (same), and *Brawer v. Horowitz,* 535 F.2d 830, 840 (3d Cir.1976) (same), with *Kimble v. McDuffy, Inc.,* 648 F.2d 340, 345–347 (5th Cir.) (*en banc*) (class-based discrimination is required), *cert. denied,* 454 U.S. 1110, 102 S.Ct. 687, 70 L.Ed.2d 651 (1981) and *Jones v. United States,* 536 F.2d 269, 271 (8th Cir.1976) (same).

The Fourth Circuit Court of Appeals reversed on certain grounds and remanded this case with the following directions to the district court:

> The factual allegations in the complaint do *not* implicate § 198[5](1) and *do* implicate the second half of § 1985(2) and § 1985(3). . . .

> Given that pro se pleadings must be read liberally, we think that the plaintiffs must be afforded the opportunity to develop a claim under both halves of § 1985(2) and under § 1985(3) on remand in the district court if the other prerequisites for a suit under these provisions are present.

> . . . . .

> The complaint clearly alleges that the conspiracy was motivated in part by ani-

jured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators.

**2.** The Fourth Circuit Court of Appeals reached the same conclusion, although it did not have the benefit of the *Kush* opinion. *Dotson and Bloch v. The Mountain Mission School, et al.,* 692 F.2d 752 (4th Cir.,1982) (unpublished). Finding persuasive other courts' decisions, the Fourth Circuit Court reasoned that "[t]he 'equality' language that is the foundation for the class-based animus requirement in § 1985(3) is conspicuously absent from the first half of § 1985(2) but is present in the second half of § 1985(2)." *Id.* at 14.

The "foundation for the class-based animus requirement" to which the Fourth Circuit Court refers is based on a key passage given in *Griffin v. Breckenridge,* 403 U.S. 88, 91 S.Ct. 1790, 29 L.Ed.2d 338 (1971):

> The language requiring intent to deprive of *equal* protection, or *equal* privileges and immunities, means that there must be some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action. The conspiracy, in other words, must aim at a deprivation of the equal enjoyment of rights secured by the law to all.

*Id.* at 102, 91 S.Ct. at 1798. (Emphasis in original). (Footnotes omitted).

mus against orphans, and we think that that is enough to invoke the portions of § 1985 that require class-based animus. . . .

*Johnny J. Dotson and Daniel F. Bloch v. The Mountain Mission School, et al.* at 11–12, 14. (Emphasis in the original). In a separate opinion, the court will state its decision concerning the allegations which apply to the first half of § 1985(2); it now considers whether the plaintiffs' cause of action can lie under the second halt of § 1985(2) and under § 1985(3).

After a careful review of the law applicable to this case, the court is of the opinion that the plaintiffs do not satisfy the requisite element of a racial or class-based animus. Thus, the private conspiratorial actions alleged against orphans are not the kind of conduct that triggers the proscription of § 1985.

▮ The court's decision is based on two grounds. First, a group of orphans does not possess "common characteristics of an inherent nature" and such a group is not afforded special protection under the equal protection clause. *Kimble v. McDuffy, Inc.*, 445 F.Supp. 269, 273 (E.D.La.1978), *aff'd* 648 F.2d 340, 347 (5th Cir.) (*en banc*), *cert. denied,* 454 U.S. 1110, 102 S.Ct. 687, 70 L.Ed.2d 651 (1981). Second, even if one assumed *arguendo* that orphans should constitute a class, animus directed against

them would be motivated by an economic status rather than by a political or racial status:[3] The United States Supreme Court recently held, however, that "§ 1985(3) [does not] reach conspiracies motivated by economic or commercial animus." *United Brotherhood of Carpenters v. Scott,* —— U.S. ——, ——, 103 S.Ct. 3352, 3360, 77 L.Ed.2d 1049, 1060 (1983). These two grounds imply, *inter alia:* that when Congress enacted the Ku Klux Klan Act of 1871, its primary purpose was to include only those conspiracies motivated by animus against Negroes and their sympathizers;[4] and that, based on a strict construction of the Act's legislative history, the conspiratorial reach of § 1985 does not include tortious acts against groups, such as orphans, whose "constituency [is] dependent on circumstances subject to ready change [and whose] character is quite different from classes based on race, ethnic origin, sex, religion, [or] political loyalty." *Murphy v. Mount Carmel High School,* 543 F.2d 1189, 1192 n. 1 (7th Cir.1976).

A brief analysis of each ground on which the court bases its decision follows. The court first determines whether orphans possess the requisite characteristics for their membership or affiliation with a particular class and, more specifically, whether orphans as a class can exist independently of the defendants' actions. To examine the

---

**3.** The Fourth Circuit Court of Appeals did not have the benefit of the recent opinion in which the Supreme Court reversed *Scott v. Moore,* 680 F.2d 979 (5th Cir.1982), when they wrote:

Since *Griffin,* the Supreme Court has not faced the question of what classes are protected by the portions of § 1985 that require class-based animus, and the decisions of the lower courts are impossible to reconcile, *see* cases cited in *Scott v. Moore,* 640 F.2d 708, 718–24 (5 Cir.1981). We think, however, that orphans are far more analogous to members of racial minorities than [they] are [to] members of a political party, ... or [to] members of other groups that have been included by the courts, *see, e.g., Scott v. Moore, supra* (nonunion workers) [*rev'd* on other grounds, *Scott v. Moore,* 680 F.2d 979 (*en banc*) (5th Cir.1982)].

*Dotson and Bloch v. The Mountain Mission School, et al.,* 692 F.2d 752 at 15.

**4.** The Supreme Court reaffirmed the genesis of the Act's legislative intent, by writing:

The narrowing amendment, which changed § 1985(3) to its present form, was proposed, debated, and adopted there, and the Senate made only technical changes to the bill. Senator Edmunds's views, since he managed the bill on the floor of the Senate, are not without weight. *But we were aware of his views in Griffin,* 403 U.S., at 102 n. 9, 91 S.Ct., at 1798 n. 9, and still withheld judgment on the question whether § 1985(3), as enacted, went any farther than its central concern—combatting the violent and other efforts of the Klan and its allies to resist and to frustrate the intended affects of the Thirteenth, Fourteenth, and Fifteenth Amendments. *Lacking other evidence of congressional intention, we follow the same course here.*

*United Brotherhood of Carpenters v. Scott,* —— U.S. at ——, 103 S.Ct. at 3660. (Emphasis added).

issue, the court uses as a frame of reference a key passage in the landmark case of *Griffin v. Breckenridge*, 403 U.S. 88, 91 S.Ct. 1790, 29 L.Ed.2d 338 (1971):

> It is thus evident that all indicators— text, companion provisions, and legislative history—point unwaiveringly to § 1985(3)'s coverage of private conspiracies. *That the statute was meant to reach private action does not, however, mean that it was intended to apply to all tortious, conspiratorial interferences with the rights of others.*

*Id.* at 101, 91 S.Ct. at 1798. (Emphasis added). The Court's language essentially implies that a class falling within the ambit of § 1985(3) cannot be defined merely as a group of victims of tortious actions. *See Askew v. Bloemker*, 548 F.2d 673, 678 (7th Cir.1976); *Lopez v. Arrowhead Ranches*, 523 F.2d 924, 928 (9th Cir.1975). In other words, the Supreme Court in *Griffin* advised that the more courts shape actions brought under § 1985 according to the statutory purposes of the Ku Klux Klan Act, the more they will avoid "the path of interpreting § 1985(3) as a general federal tort law ...." *Griffin v. Breckenridge*, 403 U.S. at 102, 91 S.Ct. at 1798.

The only "class" that the plaintiffs in the instant case suggest as a possible target of the defendants' conspiracy is one composed, broadly, of "[a]ny person (but particularly a minor or infant) who has lost both (or, sometimes, one) of his or her parents." Black's Law Dictionary 992 (5th Ed.1979). The formation of such a "class" is based on the sole fact that the plaintiffs have been denied the advantage of one or both parents during their minor years.

This group of plaintiffs shares a singular trait whose nature, unlike that of race or sex, for example, is dependent on circumstances subject to ready change. As the Third Circuit Court of Appeals put it: "[S]ex, like race ..., is an immutable characteristic determined by the accident of birth." *Novotny v. Great American Federal Savings & Loan Assoc.*, 584 F.2d 1235, 1243 (3d Cir.1978) (en banc), *rev'd* on other grounds, 442 U.S. 366, 99 S.Ct. 2345, 60 L.Ed.2d 957 (1979). Being an orphan, however, is not an "accident of birth." See *Carchman v. Korman Corp.*, 594 F.2d 354, 356 n. 1 (3d Cir.) (construing *Novotny*), *cert. denied*, 444 U.S. 898, 100 S.Ct. 205, 62 L.Ed.2d 133 (1979) (in which the Court drew a similar conclusion concerning tenant organizers).

In other words, a group of orphans possesses no other trait—economic, ethnic, geographic, racial, religious, or sexual. Their commonality of interest to bring this present suit is the only characteristic binding them as a class for the purposes of a class action: Their action may suffice for the definition of "class" under Rule 23 of the Federal Rules of Civil Procedure,[5] but it is illogical and unreasonable to designate animus against the group as class-based. Stated another way:

> The animus requisite for an action under the Ku Klux Klan Act must ... be directed against a group ("class") having common characteristics of an inherent nature [that is, the kind of class afforded special protection under the equal protection clause], *not [against] a congeries of persons who become a "class" by virtue of the denial to them of some advantage or [of] their involvement in a single common kind of action.*

*Kimble v. McDuffy, Inc.*, 445 F.Supp. at 273. (Emphasis added).

▮ In essence, this court is of the opinion that the plaintiffs possess no legal right or entitlement to have one or both of their parents during their minor years. Furthermore, their status as orphans (which may be analogous to the status of illegitimate children or children of divorced parents) does not in itself deprive them of the protection of the laws. (*See* the discus-

---

5. The court further reasons that before the defendants' alleged actions, the plaintiffs' "class" members shared no common characteristics. Since their status as a "class" of victims depends entirely upon the defendants' actions, the de-fendants certainly could never have conspired against a class that did not exist until after they allegedly had acted. *See, e.g.: Kimble v. McDuffy, Inc.*, 445 F.Supp. at 274; *Askew v. Bloemker*, 548 F.2d at 678.

sion of the law applicable to the second ground, *infra* ). The plaintiffs in this case cannot allege anything to distinguish them as intended victims other than that they belong to a class that has been denied the advantage of one or both parents—a circumstance true of all potential children born but one, nevertheless, subject to change. The creation of a class of victims by tortious conduct does not establish in itself a claim within § 1985(3): every tort creates such a class. Thus, the plaintiffs fail to state a claim under the tenets of *Griffin* because of the lack of the requisite class-based motivation.[6]

The court analyzes the second ground for its decision (that is, animus toward orphans, assumed *arguendo* to constitute a class, would be motivated because of their economic status), by using as a frame of reference certain key passages in *United Brotherhood of Carpenters v. Scott, —* U.S. ——, 103 S.Ct. 3352 (1983):

> Even if the section must be construed to reach conspiracies aimed at any class or organization on account of its political views of activities, or at any of the classes posited by Senator Edmunds, we find no convincing support in the legislative history for the proposition that the provision was intended to reach conspiracies motivated by bias towards others on account of their *economic* views, status, or activities. Such a construction would extend § 1985(3) into the economic life of the country in a way that we doubt that the 1871 Congress would have intended when it passed the provision in 1871.

> .   .   .   .   .

> We ... cannot construe § 1985(3) to reach conspiracies motivated by economic or commercial animus.... We think that such a construction of the statute, which is at best only arguable and surely

not compelled by either its language or legislative history, should be eschewed and that group actions generally resting on economic motivations should be deemed beyond the reach of § 1985(3). *Economic and commercial conflicts, we think, are best dealt with by statutes, federal or state, specifically addressed to such problems, as well as by the general law proscribing injuries to persons and property.* If we have misconstrued the intent of the 1871 Congress, or, in any event, if Congress now prefers to take a different tack, the Court will, of course enforce any statute within the power of Congress to enact.

*Id.* at ——, 103 S.Ct. at 3360–3361. (Emphasis in part added).

The Court's language implies, *inter alia:* That although the courts should construe broadly the diverse and constitutionally overtoned rights and privileges sought to be protected under § 1985, they still must derive the classes or groups to be protected from statutory construction; and that the courts should use general and statutory law as the means by which they deal with actions brought by groups whose legal issues are based on economic motivations rather than on invidiously discriminatory animus. These implications in turn provide the sources which the court used to determine whether orphans constitute an economic class: that is, by analyzing the nature of the legal issues involving orphans (or orphanages), the court found that actions concerning this group generally have rested on economic motivations.

The expression, "an orphan," very often elicits the imagery of poverty—of a poor widow rearing her fatherless child in the cruel, harsh world. Over the years, the literature and other media have portrayed such an economic view or status of the

---

**6.** *See generally* Joseph G. Cook and John L. Sobieski, Jr., Civil Rights Actions § 13.09[A] (1983) for a detailed discussion of the term "class-based animus". The authors note various groups which have been recognized as classes for the purposes of § 1985(3), such as: members of a political organization (*Bellamy v. Mason's Stores, Inc.,* 368 F.Supp. 1025 (E.D.Va.

1973), *aff'd,* 508 F.2d 504 (4th Cir.1974)). They also list other groups which have not been recognized as classes for the purposes of § 1985(3), such as: members of the Ku Klux Klan (*Bellamy v. Mason's Stores, Inc.,* 508 F.2d 504 (4th Cir.1974)) and homosexuals (*DeSantis v. Pacific Tel. & Tel. Co., Inc.,* 608 F.2d 327 (9th Cir.1979)).

orphan. Even the courts have confronted this well-known economic perception and its legal or social overtones. They generally have held, for example, that an unprovoked argument or reference by the plaintiff's counsel to the plaintiff (or a member of his family) as an orphan and to his implied status of poverty is "improper as an appeal to the sympathy of the jurors [and may be] sufficient to justify or require a reversal or new trial ...." 32 A.L.R.2d *Argument—Wealth or Poverty* § 4 (1961), p. 27.[7]

The courts also have dealt with the economic activities or concerns of orphans under a variety of subjects, including, *inter alia:* adoption[8] (with emphasis, *e.g.,* on the inheritance rights of adopted children); charities[9] (with emphases, *e.g.,* on the charitable character of educational institutions and orphanages or on the application of the cy pres doctrine to a trust for the care of orphans); inheritance and estate taxes[10] (with emphasis, *e.g.,* on the exemption, pursuant to an inheritance tax statute, of bequests or devises for the support or education of orphans); judicial notice[11] (with emphasis on the existence of the nature of common charities such as orphanages); mechanics' lien[12] (with emphasis on the nonacquirement of such a lien, pursuant to statutory law, on the property of a corporation for charitable purposes, such as an orphan-

age); schools[13] (with emphases, *e.g.,* on public aid to nonsectarian private schools or on the determination of children in orphanages as part of the school population for the purposes of apportionment of funds); state and local taxation[14] (with emphasis on orphanages as one of the charitable institutions falling within statutory laws which exempt them from taxation); veterans[15] (with emphasis on war orphans' educational assistance, pursuant to the Veterans' Education and Training Act, 38 U.S.C. §§ 1700 *et seq.*); and zoning and planning[16] (with emphasis on a zoning ordinance which excluded from a residential district a proposed orphanage to be built upon the cottage plan as unreasonable and an improper exercise of the police power). Am.Jur.2d *General Index N–Q* (1978, Supp.1983), p. 167.

A content analysis of the law applicable to each area showed, *inter alia,* that although the legal issues of one area differ with those of another, all are related to the rights and welfare of orphans and have been "dealt with by statutes, federal or state, specifically addressed to such problems, as well as by the general law proscribing injuries to persons and property." *United Brotherhood of Carpenters v. Scott,* —— U.S. at ——, 103 S.Ct. at 3361. Their nature being an economic one, the legal issues of these various areas served

**7.** An illustration of an improper argument, made in an action for an employee's death, is: "that if the statement of one of the defendant's witnesses was false he was worse than a highway robber because he would filch from the widow and orphan children their support and education, and that the children were turned out upon the cold charities of a merciless world, and that it was for the jury to say how much they should have." 32 A.L.R.2d *Argument—Wealth or Poverty* § 4 (1961), p. 28. (Citation omitted). *See also* §§ 5, 6, 17, 21 for additional examples of reference to party or member of his family as orphans.

**8.** 2 Am.Jur.2d *Adoption* § 105 (1962, Supp. 1983).

**9.** 15 Am.Jur.2d *Charities* §§ 55, 141, 174, 181 (1976, Supp.1983).

**10.** 42 Am.Jur.2d *Inheritance, Etc., Taxes* §§ 212, 215, 216 (1969).

**11.** 29 Am.Jur.2d *Evidence* § 116 (1967).

**12.** 53 Am.Jur.2d *Mechanics' Liens* § 37 (1970).

**13.** 68 Am.Jur.2d *Schools* §§ 93, 222, 311 (1973, Supp.1983).

**14.** 71 Am.Jur.2d *State and Local Taxation* § 391 (1973, Supp.1983).

**15.** 77 Am.Jur.2d *Veterans* § 165 (1975, Supp. 1983).

**16.** 82 Am.Jur.2d *Zoning and Planning* § 160 (1976, Supp.1983). (*See* 25 Am.Jur.2d *Domicil* §§ 70–72 (1966, Supp.1983), 36 Am.Jur.2d *Fraternal Orders, Etc.* § 2 (1968), 41 Am.Jur.2d *Indians* § 36 (1968), 52 Am.Jur.2d *Mandamus* § 390 (1970, Supp.1983), 81 Am.Jur.2d *Workmen's Compensation* § 207 (1976), which provide additional legal issues involving orphans.)

as the determinative factors or indicators on which this court bases its decision: Orphans constitute an economic class. Thus, the plaintiffs fail to state a claim under the tenets of *Scott*[17] because of the lack of the requisite class-based animus.

In summary, the analyses of the two grounds on which the court bases its opinion integrate the directives in *Griffin* with those in *Scott*. The law applicable to the second ground, for example, supports a claim, made under the first ground, that the status as orphans does not in itself deprive them of the protection of the laws. More importantly, both grounds confirm the conclusion that Congress in 1871 did not intend the Ku Klux Klan Act to reach tortious acts against a group of orphans, nor should the courts today recognize them as a class within the scope of those portions of § 1985 requiring class-based animus.

The court, having found that the plaintiffs do not satisfy the requisite element of class-based animus, grants summary judgment to all of the defendants insofar as any conspiracy is alleged under the second part of Section 1985(2) and Section 1985(3),

and an Order will be entered entering final judgment on these portions of Section 1985.

17. Since July 5, 1983, the date on which the Supreme Court rendered the *Scott* opinion, other courts have cited the principles of this decision. They include: *423 South Salina Street, Inc. v. The City of Syracuse*, 724 F.2d 26, 27 (2d Cir.1983) (§ 1985 does not reach an alleged conspiracy involving property tax assessments); *Hauptmann v. Wilentz*, 570 F.Supp. 351, 366 n. 6, 385–386 (D.N.J.1983) (a claim of discrimination against the plaintiff's husband, a German immigrant, does not fall within the class of victims of "historically pervasive discrimination"); *Betlyon v. Shy*, 573 F.Supp. 1402, 1407 (D.Del.1983) (civil rights complaint failed to state a cause of action against an agent of the Internal Revenue Service which arose out of the agent's implementation of the federal tax withholding system, because the system is constitutional and because the complaint made no allegations of racial or other class-based discrimination or of actions taken under the color of state, rather than federal, law); *Croatan Books, Inc. v. Commonwealth of Virginia*, 574 F.Supp. 880, 888 n. 2 (E.D.Va.1983) (the plaintiff failed to allege any discrimination based on an impermissible classification and does not fit within the protective contours of § 1985(3)); *Ferguson v. Estelle*, 718 F.2d 730, 732 (5th Cir.1983) (court affirmed the denial of writ of habeas corpus filed by the petitioners who had been convicted

for riot by arson stemming from their participation in the union/antitrust melee at a Texas construction company, *see Scott v. Moore, supra* ); *Pawelek v. Paramount Studios Corp.*, 571 F.Supp. 1082, 1084 (N.D.Ill.,E.D.,1983) (a claim of group defamation by private actors was a bizarre theory of federal civil rights liability that would not be recognized and, thus, ethnic jokes in a motion picture are not actionable); *Red Elk v. Vig*, 571 F.Supp. 422, 425 n. 4 (D.S.D.1983) (a claim was stated under § 1985 on behalf of the decedent who was struck intentionally by the defendants with a door of a moving pickup truck: the court noted the primary intent of the Ku Klux Klan Act of 1871); *Shultz v. Sundberg*, 577 F.Supp. 1491, 1498 (D.Alaska 1984) (a non-racial, politically motivated conspiracy does not state a claim under § 1985(3)); *Wilhelm v. Continental Title Co.*, 720 F.2d 1173, 1175–1177 (10th Cir.1983) a class of "handicapped persons" was not in the contemplation of Congress in 1871, and a claim of employment discrimination against such a class is not cognizable under § 1985; *see Cain v. Archdiocese of Kansas City, Kansas*, 508 F.Supp. 1021, 1027 (D.Kan.1981) (in which the court reached the same conclusion); *Fiske v. Lockheed-Georgia Co., a Division of Lockheed*, 568 F.Supp. 590, 591–595 (N.D.Ga. 1983) (§ 1985(3) does not reach politically motivated conspiracies).