292 N.J. Super. 575 (1996)
679 A.2d 657
DEBORAH SCORESE PETERSON, PLAINTIFF-APPELLANT,
v.
WAYNE BALLARD, INDIVIDUALLY AND AS VICE-PRESIDENT OF SALES OF RUSS BERRIE CO., INC. AND RUSS BERRIE COMPANY, INC., DEFENDANTS, AND TRENT S. DICKEY, ESQ., INDIVIDUALLY; JOINTLY, SEVERALLY, AND IN THE ALTERNATIVE, DEFENDANT-RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued June 11, 1996.
Decided July 15, 1996.
*578 Before Judges KEEFE, WEFING and BILDER.
Michael W. Sozansky, Jr. argued the cause for appellant (Ligorano & Sozansky, attorneys; John H. Rittley and Charles Z. Schalk, on the brief).
Charles J. Walsh argued the cause for respondent Trent S. Dickey, Esq. (Sills, Cummis, Zuckerman, Radin, Tischman, Epstein & Gross, attorneys; Steven R. Rowland, on the brief).
The opinion of the court was delivered by KEEFE, J.A.D.
We granted plaintiff Deborah Peterson's motion for leave to appeal from the entry of summary judgment dismissing her complaint against defendant Trent Dickey. The issue to be decided on appeal is whether the common law litigation privilege *579 applies to the facts of this case, and, if so, whether it was nonetheless abolished by the Law Against Discrimination (LAD), specifically N.J.S.A. 10:5-5a and -12d. Law Division Judge Victor Ashrafi held that the privilege was not abrogated, and that defendant Dickey was entitled to its protection. We affirm for the reasons stated herein.
Plaintiff is an employee of defendant Russ Berrie Company, Inc. (Russ Berrie), and defendant Wayne Ballard (Ballard) was her supervisor. A suit was instituted by plaintiff's co-employee, Maureen Gammino, against Russ Berrie and Ballard alleging sexual harassment in violation of the LAD. Plaintiff was identified by Gammino as a witness to an incident of sexual harassment committed by Ballard. Defendant Dickey, an attorney, was retained by Russ Berrie as outside counsel to represent it in the litigation.
The current litigation by plaintiff against Dickey arises out of two interviews conducted by Dickey of plaintiff in connection with Dickey's investigation into the Gammino complaint against Russ Berrie. Although there is a factual dispute as to what actually transpired during those interviews, we accept plaintiff's version for the purpose of this opinion.
Dickey's first interview with plaintiff took place on May 23, 1995, in the presence of Arnold Bloom, general counsel for Russ Berrie. Plaintiff was assured that her cooperation and truthful recounting of the facts would not affect her job status. Accordingly, she was asked and responded to questions concerning the Gammino claim. Plaintiff also indicated during the interview that she had been the subject of sexual harassment by Ballard. The first meeting was otherwise unremarkable from plaintiff's point of view.
As a result of certain information provided to Dickey during discovery of the Gammino claim, he decided to re-interview plaintiff. That interview took place on June 12, 1995, also in the presence of Arnold Bloom. Plaintiff alleges that during that interview, Dickey threatened, intimidated, and coerced her in an attempt to prevent her from making her own LAD claim and from *580 assisting in Gammino's LAD action. Specifically, plaintiff claimed that she was interrogated instead of interviewed. Her loyalty to Russ Berrie was questioned because she did not report the harassment before Gammino brought suit, and, as a result, Dickey accused her of "costing the company a lot of money[.]" She was also accused of being less than forthright during her first interview while giving Gammino's attorney damaging information. Dickey also suggested that plaintiff was going to get "a cut" of Gammino's lawsuit in return for her cooperation. Plaintiff felt that Dickey's "badgering" her on issues of company loyalty and honesty was an attempt by Dickey to get her to "recant" her prior statements on Gammino's behalf. Further, when plaintiff asked Dickey if her job was in jeopardy, Dickey simply "glared" at her, instead of reassuring her that her job was secure. Dickey's tone of questioning was loud and "intimidating" throughout the interview.
Plaintiff filed a complaint against Ballard, Russ Berrie and Dickey, alleging LAD violations. Count four specifically names Dickey and alleges that the conduct and statements described above were violations of N.J.S.A. 10:5-12d and e, in that "they were designed to coerce, intimidate threaten and/or interfere with Peterson's exercise or enjoyment of rights granted and protected by the LAD ..." Count seven also names Dickey specifically, and charges that his conduct and statements constituted intentional infliction of emotional distress.
Shortly after suit was instituted, Dickey moved to dismiss the complaint against him based upon the common law litigation privilege. A certification and brief were filed by plaintiff in opposition to the motion. In a written opinion, Judge Ashrafi held that the absolute immunity granted to an attorney in judicial or quasi-judicial proceedings extends to claims under the LAD and for the intentional infliction of emotional distress. Further, the court held that the privilege applied to Dickey on the facts of this case. We granted plaintiff's motion for leave to appeal.

*581 I
Plaintiff maintains that when the Legislature enacted N.J.S.A. 10:5-5a and N.J.S.A. 10:5-12d, it abrogated the litigation privilege under the LAD, and therefore the trial court erred in dismissing the LAD claim as to Dickey. Plaintiff also asserts that the litigation privilege does not apply to her claim for intentional infliction of emotional distress.
The litigation privilege is firmly established in New Jersey case law. Hawkins v. Harris, 141 N.J. 207, 215, 661 A.2d 284 (1995). Statements by attorneys, parties and their representatives made in the course of judicial or quasi-judicial proceedings are absolutely privileged and immune from liability. Erickson v. Marsh & McLennan Co., Inc., 117 N.J. 539, 563, 569 A.2d 793 (1990).
That immunity is predicated on the need for unfettered expression critical to advancing the underlying government interest at stake in those settings.
[Ibid.]
The privilege extends to all statements made in connection with judicial proceedings and is not limited to what a person says under oath. Ruberton v. Gabage, 280 N.J. Super. 125, 133, 654 A.2d 1002 (App.Div.), certif. denied, 142 N.J. 451, 663 A.2d 1358 (1995) (citations omitted).
Recently the New Jersey Supreme Court reaffirmed the wide acceptance and breadth of the privilege in Hawkins, supra, 141 N.J. at 222, 661 A.2d 284. In Hawkins, the Court extended the privilege to certain defamatory statements made by investigators in the course of pretrial discovery. Id. at 221, 661 A.2d 284. The Court found that the statements of an insurance investigator portraying the plaintiff, as an insurance cheat and as a suborner of perjury were privileged. Id. at 222, 661 A.2d 284. In extending the privilege to investigators, the Court looked to its historical roots, wide acceptance, and public policy purposes. It said:
Given the importance to our justice system of ensuring free access to the courts, promoting complete and truthful testimony, encouraging zealous advocacy, giving finality to judgments, and avoiding unending litigation, it is not surprising that ... *582 the litigation privilege[] has been referred to as "the backbone to an effective and smoothly operating judicial system."
[Id. at 222, 661 A.2d 284 (quoting Silberg v. Anderson, 50 Cal.3d 205, 266 Cal. Rptr. 638, 644, 786 P.2d 365, 370 (1990)).]
The litigation privilege has also been applied by our courts to bar claims for tortious conduct other than defamation. See Rainier's Dairies v. Raritan Valley Farms, Inc., 19 N.J. 552, 558, 117 A.2d 889 (1955). In Rainier's, the Supreme Court held that the immunity applied to bar a claim for the malicious interference with one's business. Id. at 563-564, 117 A.2d 889. The Court reasoned that "[i]f the policy, which in defamation actions affords an absolute privilege or immunity to statements made in judicial or quasi-judicial proceedings is really to mean anything then we must not permit its circumvention by affording an almost equally unrestricted action under a different label." Id. at 564, 117 A.2d 889. More recently in Ruberton, supra, 280 N.J. Super. 125, 654 A.2d 1002, this court held that threats of criminal prosecution made by an attorney during a settlement conference, even if tortious, were protected by the absolute privilege afforded in judicial proceedings. The court reasoned that "during such conferences an attorney must be free to advance the strengths of his or her client's case in a candid and objective way, unfettered by the fear that the attorney may be the subject of a tort action, whether sounding in defamation or any other `action under a different label.'" Id. at 133-134, 654 A.2d 1002 (quoting Rainier's Dairies, supra, 19 N.J. at 564, 117 A.2d 889). See also Middlesex Concrete Products & Excavating Corp. v. Carteret Industries Ass'n., 68 N.J. Super. 85, 92, 172 A.2d 22 (App.Div. 1961) (applying litigation privilege to bar tortious interference claim). Additionally, in Hawkins, supra, 141 N.J. at 219-220, 661 A.2d 284, the Supreme Court expressly approved the analysis of the litigation privilege set forth in Leavitt v. Bickerton, 855 F. Supp. 455 (D.Mass. 1994). In Leavitt, the plaintiff sued defendant's investigator for both defamation and the intentional infliction of emotional distress. Ibid. However, the court dismissed both claims on the basis of the litigation privilege, reasoning that a privilege against defamation would be of little *583 value if plaintiff could state a claim based upon the intentional infliction of emotional distress using the same facts. Id. at 458.
We are satisfied that plaintiff's claim against Dickey in respect of his alleged violation of the LAD and his alleged intentional infliction of emotional distress is just the type of tortious conduct to which the courts in the aforementioned cases have applied the privilege. Thus, the litigation privilege applies to the type of damages plaintiff is seeking from Dickey, unless it can be said that the Legislature abolished the privilege in the passage of the LAD. We now turn to that issue.

II
Plaintiff asserts that the language of the LAD mandates the abrogation of the litigation privilege in the context of LAD claims. N.J.S.A. 10:5-12d provides as follows:
It shall be an unlawful employment practice, or, as the case may be, an unlawful discrimination ... for any person to take reprisals against any person because that person has opposed any practices or acts forbidden under this act or because that person has filed a complaint, testified or assisted in any proceeding under this act or to coerce, intimidate, threaten or interfere with any person in the exercise or enjoyment of, or on account of that person having aided and encouraged any other person in the exercise or enjoyment of, any right granted or protected by this act.[1]
[(emphasis added).]
N.J.S.A. 10:5-5a defines "person" under the LAD as follows:
"Person" includes one or more individuals, partnerships, associations, organizations, labor organizations, corporations, legal representatives, trustees, trustees in bankruptcy, receivers, and fiduciaries.
N.J.S.A. 10:5-5e defines "employer" under LAD as follows:
"Employer" includes all persons as defined in subsection a. of this section unless otherwise specifically exempt under another section of this act, and includes the State, any political or civil subdivision thereof, and all public officers, agencies boards or bodies.
The language in the statute is clear that "legal representatives" are to be held accountable for conduct that is proscribed by the *584 LAD; i.e., coercion, intimidation, threats, and interference with LAD claims. Plaintiff argues that (1) "legal representatives" is synonymous with "attorneys;" and (2) that by using this language, the Legislature intended to abrogate the litigation privilege in the context of LAD claims.
In his opinion, Judge Ashrafi reasoned that "[i]f the Legislature intended to have N.J.S.A. 10:5-12d override common law privileges, it did not explicitly say so, and the substantial weight of precedent in this state prevents a trial court from finding implicit abrogation of the litigation privilege through a legislative enactment such as subsection (d)." We agree with that analysis.
Plaintiff concedes that there is no language expressly abrogating the privilege. However, she argues that abrogation of the privilege is implicit in the language and intent of the statute. We acknowledge that, as a remedial statute, the LAD "should be liberally construed in combination with other protections available under the laws of this State." Craig v. Suburban Cablevision, 140 N.J. 623, 629, 660 A.2d 505 (1995) (quoting N.J.S.A. 10:5-3). That being said, we still find no support for the conclusion that the Legislature intended to abrogate the litigation privilege.
Plaintiff asserts that the Legislature's intent is made clear when one reads N.J.S.A. 10:5-12d in conjunction with the definition section N.J.S.A. 10:5-5a which includes "legal representative" in the definition of "person." However, it is all but clear that the Legislature was referring to attorneys when it used the term "legal representatives," not to mention attorneys acting within the scope of their duties in furtherance of pending litigation.
The term "legal representative" occurs in a phrase which includes various entities which appear to contemplate corporate succession  "partnership, associations, organizations, labor organizations, corporations, legal representatives, trustees, trustees in bankruptcy, receivers and fiduciaries"  rather than the practice of law. N.J.S.A. 10:5-5a. In that context, it seems more likely that the 1945 Legislature was referring to some sort of corporate *585 substitute rather than outside counsel when it defined "person." That is so especially in light of the fact that the definition of "employer" incorporates all of the terms in N.J.S.A. 10:5-5a, including "legal representative." N.J.S.A. 10:5-5e. "Legal representative" in that capacity would therefore be someone who could be an "employer," unlike outside counsel.
Further, "legal representative" is used in many other definition sections of statutes and rules referring to party substitutes or groups of persons. See, e.g., N.J.S.A. 2A:15-5.1 (Comparative Negligence Act applies to actions brought by "a person or his legal representative"); N.J.S.A. 56:3-13.1 (New Jersey Trademark Act defines "applicant" to include "legal representative, successors, or assigns"); N.J.S.A. 34:11-56.1 (Worker's Compensation Act defines "employer" to include "... legal representatives, trustees, trustees in bankruptcy ..."). N.J.S.A. 10:1-12 defines "employer" as follows:
(a) "Employer" includes any individual partnership, association, corporation, business trust, legal representative or any organized group of persons acting directly or indirectly in the interest of an employer in its relations to employees.
In addition to the vagueness of the term "legal representative," it is a canon of statutory construction that statutes in derogation of the common law are to be construed narrowly. Oswin v. Shaw, 129 N.J. 290, 310, 609 A.2d 415 (1992). Doubt about the meaning of such statutes should be resolved in favor of
the effect which makes the least rather than the most change on the common law. The rule has been declared by the United States Supreme Court, as follows: `No statute is to be construed as altering the common law farther than its words import. It is not to be construed as making any innovations upon the common law which it does not fairly express.' 3 Norman J. Singer, Sutherland Statutory Construction § 61.01, at 77 (4th ed. 1986) (footnote omitted) (quoting Shaw v. Railroad Co., 101 U.S. 557, 565, 25 L.Ed. 892, 894 (1879)).
[Ibid.]
However, even if we were to hold that the term "legal representative" is synonymous with "attorney," that does not compel the conclusion that the Legislature intended to abrogate a long-standing privilege. Upholding the continuation of the privilege *586 does not frustrate the legislative goal. "[L]egal representatives" can retaliate against or "coerce, threaten or intimidate" a protected person in all sorts of non-litigation contexts where the privilege would not apply and liability would attach. That is to say, if "legal representatives" engage in prohibited conduct outside the context of an existing lawsuit an LAD violation might very well be found. Thus, more is needed to prove that there was a legislative intent to impliedly overrule the privilege than the mere conclusion that "legal representatives" means "attorneys."
We agree with the trial judge that Imbler v. Pachtman, 424 U.S. 409, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976), gives additional support to his conclusion that implied abrogation of the litigation privilege is not favored. In Imbler, the Supreme Court considered the effect of federal civil rights legislation 42 U.S.C.A § 1983, on the common law privilege barring lawsuits against prosecutors for actions performed within the scope of their duties. Ibid. Section 1983 establishes a right of action for damages against "[e]very person" who acts under color of law to deprive another of a constitutional right. A majority of the Court held that the historically recognized absolute privilege of prosecutors was not implicitly superseded by section 1983's reference to "every person." Id. at 424, 96 S.Ct. at 992, 47 L.Ed.2d at 140.
The Supreme Court relied upon its decision in Tenney v. Brandhove, 341 U.S. 367, 71 S.Ct. 783, 95 L.Ed. 1019 (1951), in which it concluded that immunities "well grounded in history and reason" had not been abrogated "by covert inclusion in the general language" of § 1983. Id. at 376, 71 S.Ct. at 788, 95 L.Ed. 1019. The Court in Tenney, reasoned that despite the statute's literal sweep, and regardless of any unworthy purpose animating their actions, legislators accused of § 1983 violations must be held to enjoy their usual immunity when acting in the field where legislators traditionally have the power to act. Id. at 379, 71 S.Ct. at 789, 95 L.Ed. 1019.
That is not to say that the Supreme Court has concluded that Congress does not have the power to abrogate a common-law *587 immunity. In Pulliam v. Allen, 466 U.S. 522, 529, 104 S.Ct. 1970, 1974, 80 L.Ed.2d 565, 571 (1984), the Court found judicial immunity to have been overridden by 42 U.S.C.A. § 1988, because the legislative reports expressly stated that § 1988 awards should be available, even when immunities might otherwise apply. Id. at 543, n. 23, 104 S.Ct. at 1981, n. 23, 80 L.Ed.2d at 580 n. 23. However, in determining whether a common law immunity has been abrogated the Court stated the rule clearly:
Our cases have proceeded upon the assumption that common-law principles of legislative and judicial immunity were incorporated into our judicial system and that they should not be abrogated absent clear legislative intent to do so.
[Id. at 529, 104 S.Ct. at 1974, 80 L.Ed.2d at 571.]
For example in Pierson v. Ray, 386 U.S. 547, 554, 87 S.Ct. 1213, 1217, 18 L.Ed.2d 288, 295 (1967), the Supreme Court declined to find statutory override of judicial immunity because the legislative record gave no clear indication that Congress intended to abolish the immunity when it enacted 42 U.S.C.A. § 1983 which makes liable "every person" who under color of law deprives another person of his civil rights. Id. at 554, 87 S.Ct. at 1217, 18 L.Ed.2d at 295. The Court presumed that "Congress would have specifically provided had it wished to abolish the" the immunity defense. Ibid. Thus, the Court held that while congressional intent need not be unmistakably clear, there must be sufficient evidence in the statute or legislative history to show a specific "clear legislative intent" to waive immunity. Pulliam, supra, 466 U.S. at 529, 104 S.Ct. at 1974, 80 L.Ed.2d at 571.
Following the Supreme Court's rule, the Ninth Circuit Court of Appeals, in Chappell v. Robbins, 73 F.3d 918, 923 (9th Cir.1996), held that in passing RICO, Congress did not intend to waive common-law legislative immunity. More specifically, the court found that the inclusion of bribery as a predicate act in 18 U.S.C.A. § 1961(1) does not require the conclusion that there was an intent to abrogate immunity, even though bribery typically involves public officials. Ibid. The court stated that it "found nothing in the nature of RICO's statutory structure which evinces *588 any clear congressional intent to abrogate the legislative immunity." Id. at 924.
Contrary to plaintiff's argument, we do not find Imbler to be distinguishable. Rather, we find clear guidance from it on this issue. Therefore, inasmuch as there is nothing in the LAD which shows a clear legislative intent to abrogate the litigation privilege, the privilege attaches in LAD cases if all other criteria are met.
We acknowledge and share Judge Ashrafi's reluctance to apply a litigation privilege in such contexts. It has been acknowledged that the trouble with privileges is that they are granted to good and bad alike. Hawkins, supra, 141 N.J. at 207, 661 A.2d 284. Yet, the litigation privilege was recently endorsed by our highest court in circumstances clearly more egregious than those that allegedly prevailed here because of the supervening public policies it serves. Id. at 222, 661 A.2d 284.
That is not to say that attorneys are free to threaten and harass witnesses in sexual harassment actions. The privilege does not protect against professional discipline for an attorney's unethical conduct. Ruberton, supra, 280 N.J. Super. at 134, 654 A.2d 1002. Further, because of its extraordinary scope, the privilege "does not extend to statements made in situations where there are no safeguards against abuse." Hawkins, supra, 141 N.J. at 221, 661 A.2d 284 (citations omitted). Therefore, the potential harm which may result from an absolute privilege is mitigated by the comprehensive control of the trial judge, and the rules of professional conduct which govern attorney conduct. Id. at 207, 661 A.2d 284.
Plaintiff argues that the trial court erred in its determination that the litigation privilege applies to the facts of this case. In Hawkins, supra, the Supreme Court articulated a four part test to determine the applicability of the litigation privilege to the facts of a given situation. 141 N.J. at 216, 661 A.2d 284. There is absolute immunity from tort liability for a communication if: (1) the statement is made in connection with a judicial or quasi-judicial *589 proceeding; (2) by litigants, counsel or other participants authorized by law; (3) to achieve the objects, including pre-trial preparation, of a litigation; and (4) it has some connection or logical relation to the action. Ibid. Whether a defendant is entitled to the privilege in a particular case is a question of law. Ibid. (citing Devlin v. Greiner, 147 N.J. Super. 446, 460, 371 A.2d 380 (Law Div. 1977)).
Judge Ashrafi found that all four of the prongs were satisfied upon these facts. Plaintiff concedes that parts one, two, and four were satisfied, however as to the third part she maintains that "under no circumstances can it be assumed that the statements of Dickey were made to achieve the objects of the litigation." Plaintiff alleges that Dickey's statements exceeded legitimate investigation, and were calculated to intimidate plaintiff into not pursuing her own cause of action and indeed possibly into not telling the truth.
As noted by Judge Ashrafi, this argument illustrates the conflict between the litigation privilege and N.J.S.A. 10:5-12d. As set forth in Hawkins, supra, the litigation privilege attaches to pretrial communications with witnesses even though they are alleged to have been conducted in a tortious manner. 141 N.J. at 218, 661 A.2d 284. In Hawkins, the Court reasoned that the privilege applied because the investigation in that case was undertaken to achieve the object of the litigation, and the statements made during the investigation had a logical relation to the action with the exception of the investigator's comment concerning the plaintiff's alleged infidelity.
Here the interview with plaintiff concerned her knowledge of the underlying Gammino litigation and statements she had made for that litigation. The investigation was clearly undertaken to achieve the object of the litigation, and defendant's questions and statements were related to the preparation for that litigation. As Judge Ashrafi found:

*590 It is appropriate for an attorney preparing for litigation in a sexual harassment case to question witnesses who have relevant information. Indeed it is the duty of the employer to investigate fully allegations of sexual harassment.
The Hawkins Court was aware that the trouble with privileges is that they protect the bad as well as the good. Id. at 213, 661 A.2d 284. However, as the Court noted, we are willing to accept such a privilege because of the supervening public policy that persons in such circumstances be allowed to speak and write freely without the restraint or fear of an ensuing action. Id. at 214, 661 A.2d 284.
The judgment under review is affirmed.
NOTES
[1] N.J.S.A. 10:5-12d was amended by L. 1992, c. 146, § 9, to include the underscored language.