Eric V. THOMAS, D.M.D., individually, Administrator, and Administrator ad prosequendum of the Estate of Tracy Rose Thomas, and as parent and natural guardian of Alix Thomas, Plaintiff.

v.

FORD MOTOR COMPANY, et al., Defendants.

No. 99–451 (SMO).

United States District Court, D. New Jersey.

Aug. 31, 2000.

James H. Pickering, Jr., South Seaville, NJ, Thomas E. Mellon, Jr., Elliot Alan Kolodny, Mellon, Webster & Mellon, Doylestown, PA, for Plaintiff.

William J. Conroy, Thomas M. Hinchey, Cabaniss, Conroy & McDonald, LLP, Turnersville, NJ, for Defendant Ford Motor Company.

Floyd Abrams, Cahill Gordon & Reindel New York City, pro hac vice.

Robert Hafner, Lavin, Coleman, O'Neil, Ricci, Finarelli & Gray, Philadelphia, PA, Anne Marie Walsh, Lord, Bissell & Brook, Chicago, IL, for Defendant TRW, Inc.

## OPINION

ROSEN, United States Magistrate Judge.

### I. Introduction

Presently before the court is the plaintiffs' motion to supplement the complaint, pursuant to Fed.R.Civ.P. 15(d), to add the following claims against Defendant Ford Motor Company: (1) violation of 42 U.S.C. § 1985(2); (2) intentional infliction of emotional distress; (3) defamation; and (4) punitive damages.[1] After careful consideration of the parties' submissions, and after further consideration of the oral argument conducted on the record on July 18, 2000, and for the reasons noted below, the plaintiffs' motion to supplement the complaint shall be *granted in part and denied in part.*

### II. Factual and Procedural History

Plaintiff Eric V. Thomas brings this products liability and wrongful death suit against Ford Motor Company ("Ford"), TRW, Inc. ("TRW") and Breed Technologies, Inc. ("Breed") following the death of his wife Tracy Thomas on February 9, 1997. According to Dr. Thomas, at around midnight on that date, Ms. Thomas, then thirty-seven years old and six months pregnant, was driving the family's 1996 Ford Explorer, accompanied by her husband, Dr. Thomas, and their eighteen month old daughter, Alix. (*See* Complaint, ¶ 15; Plaintiffs' Memorandum of Law in Support of Motion for Leave to Amend the

---

1. Although the plaintiffs brought their motion under Fed.R.Civ.P. 15(a), because the facts underlying the proposed amendment arose since the filing of the initial complaint, the court shall treat this motion as one to supplement the pleadings under Fed.R.Civ.P. 15(d).

Complaint, at 4 (hereinafter "Ps' Brief")). The Thomas's were allegedly taking their daughter to the emergency room of the local hospital for treatment of a high fever. (*See* Ps' Brief, Exhibit A, at 18). Because of snowy road conditions, Ms. Thomas was driving slowly. (Complaint, ¶ 17). En route to the hospital, Ms. Thomas allegedly swerved to avoid a deer and lost control of her car, striking a utility pole on the side of the road. (Complaint, ¶ 18; Ps' Brief, Ex. A, at 18). Upon impact, notwithstanding the Explorer's moderate pace, both the driver-side and the passenger air bags deployed. (Complaint, ¶¶ 21–24). The vehicle, with the family inside, was discovered at approximately 2:00 a.m. (Middle Township Police Department Accident Report, p. 6, attached as Exhibit C to Ps' Brief). Emergency services personnel found Dr. Thomas apparently unconscious in the front passenger seat (*id.* at 2) and Alix unhurt in the backseat of the vehicle. (*Id.* at 10). Tracy Thomas, however, was pronounced dead at the scene. (*Id.* at 2).

On February 1, 1999, Dr. Thomas filed suit against Ford, TRW and Breed[2], seeking relief individually as well as on behalf of his minor daughter and the estate of his late wife, for the death of Tracy Thomas on the theory that the Explorer's air bag was defective. Fundamentally, the plaintiffs assert that "[b]ut for the improper deployment of the airbag, Tracy and her unborn child would have survived the minor collision with little or no injury." (Complaint, ¶ 23). Following the dismissal of Breed Technologies, Inc.,[3] Dr. Thomas filed an amended complaint which charges the remaining defendants with wrongful death under N.J.S.A. 2A:31–1, et seq. and N.J.S.A. 2A:15–3 (Counts I and II), statutory product liability under N.J.S.A. 2A:58C–8 (Counts III and IV), common law negligence (Count V), breach of express warranty under N.J.S.A. 12A:2–101, et seq. (Count VI), and punitive damages based on this alleged conduct (Counts VII and X).[4]

This court held an initial scheduling conference, after which discovery commenced. It is the ensuing conduct, both actual and alleged, of Defendant Ford and its counsel that elicited the plaintiffs' present motion.

The plaintiffs contend that during January and February 2000 Defendant Ford attempted to intimidate Dr. Thomas from continuing the instant lawsuit in violation of the plaintiffs' civil rights, spreading defamatory information and causing Dr. Thomas emotional distress. (*See* Proposed Supplemental Complaint, ¶¶ 79–109). The intimidation allegedly derived from Ford's communications with the Office of the Prosecutor for Cape May County, the Office of County Medical Examiner for Cape May County and the Middle Township Police Department. (*Id.* at ¶¶ 79–83). According to the plaintiffs, Ford, through its "authorized agents and representatives," told these local authorities that it was not the air bag that killed Tracy Thomas, but rather that Dr. Thomas murdered his wife. (*Id.* at ¶¶ 78–80; Ps' Brief at 10). Ford allegedly contacted these local authorities hoping to persuade them to initiate a criminal investigation of Dr. Thomas. (Ps' Brief, at 10). The plaintiffs further assert that Ford made these accusations, "knowing them to be false or with reckless disregard for [their] truth[,]" with the "intent that they ultimately would intimidate and deter Plaintiff Eric Thomas from proceed-

---

2. TRW and Breed were included as defendants as the former corporation allegedly manufactured and sold the air bag sensor, and the latter allegedly manufactured and sold the air bag module. (Complaint, ¶¶ 6, 7).

3. The plaintiffs initially named Breed Technologies, Inc. as a defendant, but voluntarily dismissed Breed in October 1999 following Breed's entry into Chapter 11 bankruptcy.

*See* Notice of automatic stay by Breed Technologies, Inc. Re: Chapter 11 Bankruptcy Petition dated September 23, 1999; Notice of Voluntary Dismissal without prejudice dated October 12, 1999.

4. The First Amended Complaint does not contain a Count VIII or a Count IX.

ing with this lawsuit." (Proposed Supplemental Complaint, ¶¶ 83–85).

For the purposes of the present motion to supplement the complaint, Defendant Ford does not contest the factual assertions of the plaintiffs. Instead, Ford opposes the supplement on the ground that it is futile as a matter of law. First, the defendant argues that the allegations in the proposed supplemental complaint fail to state a claim for civil rights conspiracy under Section 1985(2). (Defendant's Memorandum of Law in Opposition to Plaintiffs' Motion for Leave to Amend Complaint, at 4) (hereinafter "D's Brief"). Ford contends that no conspiracy existed, because the intracorporate-conspiracy doctrine bars the claim as to Ford's employees and agents, and the attorney-client privilege shields Ford's own attorney's conduct. Ford further contends that its alleged conduct does not meet the requisite level of intimidation. Finally, Ford argues that the plaintiff has not sustained an injury sufficient under the statute.

Second, Ford posits that both the emotional distress and the defamation claims are barred by the litigation privilege; Ford claims that its agents were acting within the scope of this litigation when communicating with the medical examiner, the prosecutor and the police department. (D's Brief at 20). Specifically, Ford explains that it intends to defend the case by arguing that the air bag could not have caused Ms. Thomas's injuries, but rather that Ms. Thomas's injuries are more consistent with manual strangulation. (Id.). Ford contends that the individuals through whom Ford acted—namely, William Conroy, counsel for Ford, Joseph Wills, a Ford design analysis engineer, and Gerald E. Corwin, Ford's expert (see Proposed Supplemental Complaint ¶ 79)—were acting on behalf of Ford in relation to this defense. (D's Brief at 26). Ford further asserts that a criminal investigation of Dr. Thomas would have a significant impact on its planned defense in the pending litigation. (Id. at 22). Thus, Ford's agents' state-

ments were related to the litigation and uttered in the course of the judicial proceeding and, as such, are covered by the litigation privilege. (Id. at 24–25).

Finally, as to the plaintiffs' claim for punitive damages based on the three proposed additional causes of action, Ford argues that since the plaintiffs have failed to state a claim upon which relief can be granted, the request for punitive damages, as a derivative claim, should be denied as moot. (D's Brief at 32).

## III. Discussion

### A. Supplementing the Pleadings

The Federal Rules of Civil Procedure encourage and provide for a liberal policy for amending pleadings. Liberality is the rule with regard to supplemental pleadings under Fed.R.Civ.P. 15(d) as well. Rule 15(d) is the appropriate vehicle for amendment where, as here, the additional pleading "set[s] forth transactions or occurrences or events which have happened since the date of the pleading sought to be supplemented." Fed.R.Civ.P. 15(d); see Glenside West Corp. v. Exxon Co., U.S.A., 761 F.Supp. 1118, 1133 (D.N.J.1991). "The purpose of Rule 15(d) is to promote as complete an adjudication of the dispute between the parties as possible by allowing the addition of claims which arise after the initial pleadings are filed." Glenside, 761 F.Supp. at 1133 (internal quotations omitted). Consequently, although Rule 15(d) does not include Rule 15(a)'s mandate that leave to amend be "freely given when justice so requires," the same standards apply to motions under both of these subdivisions of Rule 15. Glenside, 761 F.Supp. at 1133 (citing Owens–Illinois, Inc. v. Lake Shore Land Co., 610 F.2d 1185, 1188–89 (3d Cir.1979)); United States v. Local 560, 694 F.Supp. 1158, 1186 (D.N.J.), aff'd, 865 F.2d 253 (3d Cir.1988). The function of the rule is to bring the action up to date by adding new facts that have occurred since the filing of the original pleading and that affect the controversy and the relief sought.

In *Foman v. Davis,* 371 U.S. 178, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962), the Supreme Court articulated the liberal policy of allowing amendments as follows:

> If the underlying facts or circumstances relied upon by a plaintiff may be a proper subject of relief, he ought to be afforded an opportunity to test his claim on the merits. In the absence of any apparent or undeclared reasons—such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.—the leave sought should, as the rules require, be "freely given."

*Id.* at 182, 83 S.Ct. 227. The Third Circuit has elaborated on the proper analysis to apply:

> The trial court's discretion under Rule 15, however, must be tempered by considerations of prejudice to the non-moving party, for undue prejudice is "the touchstone for the denial of leave to amend." In the absence of substantial or undue prejudice, denial must be grounded in bad faith or dilatory motives, truly undue or unexplained delay, repeated failure to cure deficiency by amendments previously allowed or futility of amendment.

*Heyl & Patterson International, Inc. v. F.D. Rich Housing of the Virgin Islands,* 663 F.2d 419, 425 (3d Cir.1981) (citing *Cornell & Co., Inc. v. Occupational Safety and Health Review Comm'n,* 573 F.2d 820, 823 (3d Cir.1978)).

■ It is well established that the futility of amendment is one of the factors that may be considered in denying a motion to amend or supplement the pleadings. *Foman,* 371 U.S. at 182, 83 S.Ct. 227; *Glenside,* 761 F.Supp. at 1134. *See also In re Burlington Coat Factory Securities Litigation,* 114 F.3d 1410, 1434 (3d Cir.1997); *Federal Deposit Insurance Corp. v. Bathgate,* 27 F.3d 850, 874 (3d Cir.1994); *Averbach v. Rival Mfg. Co.,* 879 F.2d 1196, 1203 (3d Cir.1989). However, given the liberal standard applied to the amendment of pleadings, courts place a heavy burden on opponents who wish to declare a proposed amendment futile. Under Third Circuit jurisprudence, " '[f]utility' means that the complaint, as amended, would fail to state a claim upon which relief could be granted." *In re Burlington Coat Factory Securities Litigation,* 114 F.3d at 1434. *See also Massarsky v. General Motors Corp.,* 706 F.2d 111, 125 (3d Cir.), *cert. denied,* 464 U.S. 937, 104 S.Ct. 348, 78 L.Ed.2d 314 (1983) ("the trial court may properly deny leave to amend where the amendment would not withstand a motion to dismiss"). Thus, if the proposed amendment "is frivolous or advances a claim or defense that is legally insufficient on its face, the court may deny leave to amend. If a proposed amendment is not clearly futile, then denial of leave to amend is improper." 6 CHARLES A. WRIGHT, ARTHUR R. MILLER AND MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE § 1487 at 637–642 (2d ed.1990) (footnote omitted).

To demonstrate that a claim is "legally insufficient on its face," and that it could not withstand a motion to dismiss, the opposing party must be able to demonstrate that "it appears beyond doubt that the [party] can prove no set of facts in support of [the] claim which would entitle [the party] to relief." *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974).

## B. Civil Rights Conspiracy Under the First Clause of 42 U.S.C. § 1985(2)

Section 1985(2) has two logical subdivisions; the first addresses interference with federal litigation and the second concerns obstruction of justice at the state court level. *See Kush v. Rutledge,* 460 U.S. 719, 724–25, 103 S.Ct. 1483, 75 L.Ed.2d 413 (1983). The plaintiffs seek to assert a claim against Ford under the first clause of 42 U.S.C. § 1985(2) on the ground that

Ford conspired to interfere with their civil right to pursue a federal claim. (Ps' Brief at 13). For the reasons which follow, this court cannot find the conduct ascribed to Defendant Ford in this matter constitutionally corrupt.

Section 1985(2), clause one, provides that an action for damages may be brought

[i]f two or more persons in any State or Territory conspire to deter, by force, intimidation, or threat, any party or witness in any court of the United States from attending such court, or from testifying to any matter pending therein, freely, fully, and truthfully, or to injure such party or witness in his person or property on account of his having so attended or testified[.]

42 U.S.C. § 1985(2).[5] This first clause of § 1985(2) targets conspiracies "the object of which is intimidation of or retaliation against parties or witnesses, or grand or petit jurors, in any court of the United States." *Brawer v. Horowitz,* 535 F.2d 830, 840 (3d Cir.1976). Actions brought under the civil rights conspiracy statute, particularly where private and not state action is proscribed, must be carefully construed in accordance with statutory purposes to avoid creation of a general federal tort law. *See Griffin v. Breckenridge,* 403 U.S. 88, 99–101, 91 S.Ct. 1790, 29 L.Ed.2d 338 (1971) (construing 42 U.S.C. § 1985(3)). *See also U.S. v. Morrison,* 529 U.S. 598, 120 S.Ct. 1740, 1752–54, 146 L.Ed.2d 658 (2000) (discussing extension of the Commerce Clause to encompass private acts of violence against women). "To

avoid the 'constitutional shoals' attendant an impermissibly overbroad statutory interpretation, ... we must look to the specific conspiracies proscribed by Congress." *Brawer,* 535 F.2d at 839 (discussing the legislative rationale of § 1985(2)).

The nascence of this remedy lies in the smoldering embers of the Civil War. After the war, as part of the reconstruction, Congress granted universal suffrage to all men [6], regardless of race, including Southern men who had fought for scission. U.S. Const., amend. XV, § 1. The extension of this right, as well as general opposition to reconstruction era legislation, led to the organization of an underground, politically-driven society: the Ku Klux Klan. *See* Cong. Globe, 42d Congress, 1st Sess. 319–322 (1871) (Statement of Rep. Stoughton). Although the Klan's violence and atrocities were directed mainly against African Americans, Republican governmental and judicial officials also had cause to fear retribution for their political ideology. *See id.* at 320–22 (Rep.Stoughton), 436–38 (Statement of Rep. Cobb, proponent). The Klan proved powerful enough in some areas of the South to subvert the ability of the local governments to function. Cong. Globe, *supra,* at 319–20. Indeed, the Klan's activities produced anarchy in several states, with political and social upheaval severe enough to attract the attention of President Grant in March of 1871. *See id.* at 412–413 (Statement of Rep. Roberts, proponent) and at 244 (Statement of President Grant). In response to the President's concern, Representative Shel-

---

**5.** The Third Circuit has long held that the first part of Section 1985(2) "aims at conspiracies the object of which is intimidation of or retaliation against parties or witnesses, or grand or petit jurors, in any court of the United States. [And, therefore,] [t]he federal nexus [ ] is not the class-based, invidiously discriminatory animus required by the second half of the subsection, but the connection of the proscribed activities to a federal court." *Brawer v. Horowitz,* 535 F.2d 830, 840 (3d Cir.1976). *See also Kush v. Rutledge,* 460 U.S. 719, 727, 103 S.Ct. 1483, 75 L.Ed.2d 413 (1983) ("Given the structure of § 2 of the 1871 Act, it is clear that Congress did not intend to impose a

requirement of class-based animus on persons seeking to prove a violation of their rights under the first clause of § 1985(2)."); *Heffernan v. Hunter,* 189 F.3d 405, 409–10 (3d Cir.1999) (same). The plaintiff relies on the first part of Section 1985(2) as a legal basis for his proposed amended claim. (Plaintiff's Brief at 13). Therefore, no proof of invidious, class-based discrimination is required.

**6.** Women did not attain suffrage until 1920 with ratification of the Nineteenth Amendment.

labarger of Ohio sponsored a bill entitled "An Act to enforce the Provisions of the Fourteenth Amendment to the Constitution of the United States, and for other purposes," H.R. 320, 42d Cong., 1st Sess., Cong. Globe, at 317, which spawned a heated debate in both the House and the Senate.

For the proponents, the bill's purpose can be found in the political nature of the lawless activities:

> Three facts combine to show the necessity for a bill substantially like that now under consideration. First, the violence and lawlessness, for which it is proposed to provide a remedy, occur in many widely separated districts; second, the character of the victims selected and the methods of outrage, indicate a common source and purpose, an organized conspiracy; and, third, the organization to which they are traced is political in its origin and aims, and is military in form....
>
> These acts of violence are not directed against colored citizens only, although if they were that would be no palliation of their enormity; for the nation is under especial obligation to protect those whom it has just introduced to its privileges and its responsibilities....
>
> But one rule never fails: the victims whose property is destroyed, whose persons are mutilated, whose lives are sacrificed, are always Republican.

Cong. Globe, *supra*, at 412 (Statement of Rep. Roberts). In contradistinction, chief among the concerns of the opponents was the usurpation of state rights by an overreaching federal government:

> The constitutional question involved is as to the power of Congress to go into a State and punish offenses, not against the laws of the United States, which Congress has any right to pass, but merely to punish ordinary crimes, such as are punishable by the State law. Whenever that question shall come, if there is any respect left for the Constitution, if there is any respect left for the

decisions of the Supreme Court, I will show you ... that you have no such power at all.

Cong. Globe, *supra*, at 222 (Statement of Senator Allen G. Thurman). Consequently, the final bill sought to achieve a delicate balance between the safety of the populace and the usurpation of state rights.

Courts that have construed the statute have been sensitive to maintain the balance between protection of the people's civil rights and recognition of the limitations of a federal system. For example, in *Brawer v. Horowitz*, 535 F.2d 830 (3d Cir. 1976), the court considered the application of § 1985(2) to allegations of conspiracy to submit perjured testimony and to conceal exculpatory evidence. Brawer was tried and convicted for conspiring to transport stolen United States Treasury Bills and of actually transporting those bills. One of Brawer's co-conspirators, Slavatore Mauceli, testified for the government. After losing on appeal, Brawer filed a civil rights suit against Mauceli and Horowitz, Brawer's prosecuting Assistant U.S. Attorney. In that civil claim, Brawer asserted, inter alia, that Mauceli and Horowitz had conspired "to injure, oppress and procure the convictions of [Brawer] with the knowing use of false and perjured testimony[,]" depriving Brawer of a fair trial in violation of the first clause of § 1985(2). 535 F.2d at 832. After reviewing the legislative history, the court rejected the plaintiff's claim. The court found that, even assuming Mauceli did present perjured testimony and withhold exculpatory evidence, the statute simply does not extend to the alleged conduct. *Id.* at 840. The court concluded: "At best, the allegation is that the conspiracy 'influenced' the jurors by precluding them from considering fully accurate evidence. We deem this 'influence' too remote to fit within the intended ambit of § 1985(2)." *Id.*

■ In the instant case, the plaintiffs urge this court to extend the protection of § 1985(2) to conduct similar in kind but

even more attenuated from the federal rights which the statute was designed to protect. Ford is charged with attempting to influence a state criminal prosecutor through the presentation of false evidence in the form, for example, of expert opinions regarding the cause of Ms. Thomas's death. By the plaintiffs' own terms, the alleged false information was forwarded to those authorities with the object of influencing the state prosecutor to open a criminal investigation with Dr. Thomas as the target. As the Third Circuit considered perjured testimony offered in the direct underlying case too remote to state a claim under § 1985(2), a fortiori, false information supplied to a criminal prosecutor in an effort to incite a completely distinct criminal investigation is an "impermissibly generous" interpretation of the statute. *Brawer*, 535 F.2d at 840.

This reasoning applies equally to the purported withholding from the authorities such allegedly exculpatory evidence as the report of the United States Department of Transportation National Highway Traffic Safety Administration (hereinafter "NHTSA"). (Ps' Brief at 10). Even assuming, arguendo, that the NHTSA report contains exculpatory evidence, failure to provide the law enforcement authorities with this evidence cannot amount to "conspiratorial conduct that *directly affects* or seeks to affect parties, witnesses or grand or petit jurors." *Brawer*, 535 F.2d at 840 (emphasis supplied). Dr. Thomas's participation in the instant federal civil claim was not directly affected by Ford's presentation of evidence to state law enforcement authorities. The court does not doubt that Ford's efforts before the prosecutor required the attention of both Dr. Thomas and his counsel. Any diversion of energy, however, had only a tangential effect on the federal litigation, and is thus insufficient to state a claim under § 1985(2). *Brawer*, 535 F.2d at 839–40; *see also Brown v. Chaffee*, 612 F.2d 497, 502 (10th Cir.1979) (rejecting § 1985(2) (first clause) claim based on a failure to effectively defend the plaintiff in the underlying action because such allegations do not directly affect the matter).

The court further declines to adopt the plaintiffs' interpretation of § 1985(2), as such an interpretation runs counter to the American system of jurisprudence. The plaintiffs ask the court to consider "[w]hat could be more coercive than having Defendant falsely report to law enforcement authorities that Dr. Thomas murdered his wife?" (Ps' Brief at 14). The plaintiffs reprimand Ford for this conduct with vehemence, contending that "[t]he ramifications of such blatantly outrageous behavior are chilling." (*Id.*). The court recognizes the potentially devastating effect that commencement of a murder investigation by the Cape May County prosecutor could have on Dr. Thomas personally. However, the court equally recognizes the potentially devastating effect of Dr. Thomas's allegations that Ford, with "wanton and wilful disregard," (First Amended Complaint, ¶ 72), for the consequences of its conduct, designed, manufactured and sold a car with air bags that caused Ms. Thomas's death. This court, in this motion, does not act as arbiter of the facts. Each side makes notorious accusations against the other. Both scenarios describe a terrible tragedy. Yet, the forum for testing the veritude of conflicting declarations is in the crucible of the litigation process.

Should the court allow this supplement, it would be essentially exposing any litigant with a nefarious defense to a federal civil rights claim. Many classes of cases and defenses would be elevated to a constitutional level. For example, it is not uncommon in matrimonial cases for one spouse to contact law enforcement authorities, accusing the other spouse of all manner of illegal conduct—child abuse, spousal abuse, theft. Each of these criminal complaints could be used to transform that matrimonial matter into a federal civil rights claim. Similarly, in employment discrimination cases, the employer-defendant may defend itself by accusing the

employee-plaintiff of illegal conduct such as falsifying company records or embezzlement. Amendment could be sought in these cases as well.

Indeed, under the plaintiffs' construction, the plaintiffs themselves could also be charged with civil rights violations. The plaintiffs forwarded information to the NHTSA, and later to the Cape May County prosecutor and medical examiner, with the intention of obtaining a finding that the air bag caused Ms. Thomas's death. (*See* Ps' Brief, Ex. A, *passim,* detailing information supplied by Dr. Thomas to the NHTSA; Ex. G, Letter of Dr. Gross dated April 14, 2000). In fact, Dr. Gross, the Cape May County Medical Examiner who performed the autopsy, forwarded a letter to both counsel for the plaintiffs and counsel for Ford indicating that despite both counsel's best efforts, he would not adjust his medical report:

> I have the impression that, on the one hand, *Mr. Conroy* [Ford's counsel] hopes that I will adjust my opinion, at a minimum, so as to exclude the possibility that the air bag contributed to this death, while, on the other hand, *Mr. Mellon* [Dr. Thomas's counsel] hopes that I will adjust my opinion, at a minimum, so as to conclude that the microscopic slide unequivocally demonstrates objective injury to the decedent's cervical cord....
>
> Here, [ ] it would appear that your objectives are not so much to persuade me to amend my formal finding regarding cause and/or manner of death—but rather to persuade me to incorporate into my underlying analysis some specific factual findings regarding the actual mechanism of death which would lend credence to your respective (but obviously conflicting) views of exactly how Ms. Thomas came to her dying moment....
>
> I do not embrace or reject the opinions of other experts who may have reached certain more explicit conclusions about just what caused this death or just how

this death occurred. Quite candidly, the business of determining the mechanisms of unwitnessed deaths is not an exact science.

(*Id.* at 2–3 (emphasis in original)). Given the plaintiffs' equally pro-active conduct, Ford could argue that Dr. Thomas supplied this information with the intention of intimidating Ford from fully defending the lawsuit. Indeed, Dr. Gross recognized what the plaintiffs in this case do not, that "[t]he demands of [his] public office do not suggest a need (or a justification) for [him] to go where either of the litigants in this case have invited [him]." (*Id.* at 3).

Unquestionably, the stakes in this case are very high, for both Dr. Thomas and Ford. That, for good or for ill, is the nature of our adversarial system. The infamy accompanying Ford's accusations against Dr. Thomas, however, do not alter the fundamental essence of the act: Ford contacted a state prosecutor, not Dr. Thomas, and offered information in a lawful way. The offering may have been in good faith or with malice; the proffer may be true or may be false. Regardless, Ford did not present this information to the law enforcement authorities by way of intimidation, threat or violence, and this conduct does not constitute a violation of a litigant's constitutional rights. That is not to say that there is no conduct by a litigant that would amount to a civil rights violation. To the contrary, this court can envision instances where a litigant would cross the line between pursuing or defending a claim and violating another's civil rights. Moreover, case law has sustained application of the act to such extreme conduct. In *Chahal v. Paine Webber Inc.,* 725 F.2d 20 (2d Cir.1984), the court allowed a § 1985(2) claim to proceed based upon allegations that Paine Webber had contacted the employer of Chahal's expert and supplied information to that employer that the expert was violating a New York Stock Exchange rule. The employer then threatened to terminate the expert, resulting in the expert refusing to testify in

Chahal's case. Paine Webber did not report the expert's alleged conduct to the appropriate authorities. Instead, Paine Webber sought to gain advantage over the plaintiff through back-door tactics. The plaintiffs have not presented this court with such directly threatening conduct.

Unlike Paine Webber, Ford did not seek to achieve an advantage by contacting Dr. Thomas, either by threatening to publicize its planned defense or in any other way. Rather, Ford contacted state prosecutorial authorities, offered evidence and left those authorities to proceed as they saw fit. As Senator Allen G. Thurman (Ohio) commented during the debates in 1871:

> [I]t has been said that "hard cases make shipwreck of principle." ... and hard cases or supposed emergencies too often make shipwreck of constitutions. I know that under a great clamor of excitement Congress may be induced to exercise powers that, in its sober moments and without excitement, it would shrink with horror from attempting to exercise. We have seen too much of that in the past history of the country; but I do hope that the time has not come when for the purpose of curing one evil the very law-making body of the Government, each member of which is sworn to support the Constitution, will commit the far greater evil of overthrowing that instrument!

Cong. Globe, *supra*, at 222. The gladiatorial aspect of our adversarial system may engender disdain, but this court will not, at the risk of overthrowing that system and the instrument which it protects, find that attempting to utilize the system amounts to a breach of the Constitution.

### C. The Litigation Privilege as a Bar to the Intentional Infliction of Emotional Distress and Defamation Claims

#### 1. Intentional Infliction of Emotional Distress

While the allegations do not support a civil rights claim, they do support a claim for both intentional infliction of emotional distress and defamation.

■ Under New Jersey law, to state a cause of action for intentional infliction of emotional distress, the plaintiff "must establish intentional and outrageous conduct by the defendant, proximate cause, and distress that is severe." *Buckley v. Trenton Saving Fund Society*, 111 N.J. 355, 366, 544 A.2d 857 (1988); *see also Taylor v. Metzger*, 152 N.J. 490, 517, 706 A.2d 685 (1998). "The conduct must be 'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.'" *Buckley*, 111 N.J. at 366, 544 A.2d 857 (quoting Restatement (Second) of Torts, § 46 cmt. d). A plaintiff has a heavy burden in proving this tort, as this cause of action tolerates many kinds of unjust and unfair behavior and is, therefore, of limited scope. *See Poveromo-Spring v. Exxon Corp.*, 968 F.Supp. 219, 228 (D.N.J.1997).

■ Dr. Thomas has alleged facts sufficient to meet this prima facie burden. Dr. Thomas asserts that Ford acted intentionally or recklessly in pursuing the prosecutor to open the investigation against Dr. Thomas. (Proposed Supplemental Complaint, ¶ 84). He further claims that Ford acted with gross misconduct by accusing him of murder and, therefore, Ford could foresee the substantial effect that this would have on him. (*Id.*, ¶ 94). Finally, Dr. Thomas has stated that his emotional distress results directly from being accused of murdering his wife. (*Id.*, ¶ 97). Therefore, Dr. Thomas has presented the requisite prima facie showing.

#### 2. Defamation

■ Dr. Thomas has similarly stated a claim for defamation. A statement is defamatory if it "is false and is injurious to the reputation of another or exposes another person to hatred, contempt, or ridicule or subjects another person to a loss of

good will and confidence in which he or she is held by others." *Higgins v. Pascack Valley Hospital,* 158 N.J. 404, 426, 730 A.2d 327 (1999) (internal quotations omitted). The determination that a statement is defamatory is a question of law for the court to decide. *See id.* Furthermore, truthful statements of facts are not defamatory. *See id.* at 427, 730 A.2d 327 (holding that statements regarding an investigation of an employee were not defamatory because they did not attack her reputation, but only stated the facts).

■■■ There are four categories of slanderous statements that do not require the plaintiff to show special damages. These categories are "statements that impute (1) the commission of a crime, (2) contraction of a loathsome disease, (3) occupational misconduct or incompetence, and (4) unchastity of a women." *Ward v. Zelikovsky,* 136 N.J. 516, 526, 643 A.2d 972 (1994). When these types of statements are made, the court will presume the plaintiff's reputation has been injured without requiring proof. *See Hall v. Heavey,* 195 N.J.Super. 590, 594, 481 A.2d 294 (App.Div.1984). Moreover, the imputation of a crime is slanderous per se regardless of whether the offense is indictable or not. *See id.* at 597, 481 A.2d 294. Because Dr. Thomas has alleged that Ford has accused him of committing a crime, Dr. Thomas has sufficiently stated a prima facie claim of defamation.

### 3. The Litigation Privilege

Ford does not contest that the plaintiff has stated a prima facie claim of intentional infliction of emotional distress or defamation. Rather, the defendant claims that New Jersey's litigation privilege absolutely bars such claims.

New Jersey law recognizes both a qualified and absolute litigation privilege. *See Fees v. Trow,* 105 N.J. 330, 336, 521 A.2d 824 (1987). Such privileges are extended to protect speech "in those narrowly defined instances in which the public interest in unrestrained communication outweighs

the right of redress." *Id.* In determining the appropriate privilege, a court must consider the circumstances underlying the communication, weighing the competing public and individual interests.

■■ New Jersey law has long recognized an absolute privilege for lawyers, judges, witnesses and jurors who make statements during the course of judicial, administrative, or legislative proceedings that would otherwise be defamatory. *See Hawkins v. Harris,* 141 N.J. 207, 222, 661 A.2d 284 (1995); *Erickson v. Marsh & McLennan Co.,* 117 N.J. 539, 563, 569 A.2d 793 (1990). "That immunity is predicated on the need for unfettered expression critical to advancing the underlying government interest at stake in those settings." *Erickson,* 117 N.J. at 563, 569 A.2d 793. Such an absolute privilege can be established if the statement (1) is made in the course of judicial or quasi-judicial proceedings (2) by litigants or other participants authorized by law (3) to achieve the objects of the litigation (4) where the statements have some logical relationship or connection to the action. *See Hawkins,* 141 N.J. at 216, 661 A.2d 284. An absolute privilege should be found only in the narrowest of circumstances because it provides protection even for maliciously spoken untruths. *See Geyer v. Faiella,* 279 N.J.Super. 386, 392, 652 A.2d 1245 (App.Div. 1995).

The absolute litigation privilege, now over 600 years old, has expanded over time. *See Hawkins,* 141 N.J. at 221, 661 A.2d 284. At present, it is broadly construed to encompass all conduct related to the litigation, whether in or out of court, whether in the pre-trial phase or during the trial, whether or not under oath, and whether committed by a litigant, an attorney or an attorney's agent. *See id.* at 221–22, 661 A.2d 284; *see also Peterson v. Ballard,* 292 N.J.Super. 575, 581, 679 A.2d 657 (App.Div.1996) (discussing development of the privilege and collecting cases). Moreover, while originally limited to de-

famatory statements, the privilege has been extended to bar several other types of suits, including those involving the intentional infliction of emotional distress. *See Peterson,* 292 N.J.Super. at 582–83, 679 A.2d 657 (citing *Hawkins,* 141 N.J. at 219–220, 661 A.2d 284).

Because of the privilege's breadth, the touchstone of the absolute litigation privilege has become the court's control over the alleged defamatory or otherwise abusive conduct. The New Jersey Supreme Court recently discussed this limitation, opining:

> Because of their extraordinary scope, absolute privileges have been limited to situations in which authorities have the power both to discipline persons whose statements exceed the bounds of permissible conduct and to strike such statements from the record.... The absolute privilege does not extend to statements made in situations for which there are no safeguards against abuse.

*Hawkins,* 141 N.J. at 220–21, 661 A.2d 284 (internal citations and quotations omitted). *See also Rainier's Dairies v. Raritan Valley Farms, Inc.,* 19 N.J. 552, 562, 117 A.2d 889 (1955) ("in strictly judicial proceedings the potential harm which may result from the absolute privilege is somewhat mitigated by the formal requirements such as notice and hearing, the comprehensive control exercised by the trial judge whose action is reviewable on appeal, and the availability of retarding influences such as false swearing and perjury prosecutions"); *Peterson,* 292 N.J.Super. at 587, 679 A.2d 657 ("[T]he potential harm which may result from an absolute privilege is mitigated by the comprehensive control of the trial judge, and the rules of professional conduct which govern attorney conduct.").

This court has broad remedial powers, both codified and inherent, to sanction abusive conduct occurring within the litigation context. *See, e.g.,* Fed.R.Civ.P. 16, 37, 11; 28 U.S.C. § 1927; *Chambers v. NASCO, Inc.,* 501 U.S. 32, 43, 111 S.Ct. 2123, 115 L.Ed.2d 27 (1991). Indeed, this court has recently reiterated the presence and scope of these powers in the context of barring a suit under the litigation privilege. *See Thomason v. Lehrer,* 183 F.R.D. 161 (D.N.J.1998), *aff'd,* 189 F.3d 465 (3d Cir.1999). In *Thomason,* the court dismissed a claim by an attorney pursuant to the absolute litigation bar. Thomason was the attorney for a plaintiff in a federal suit before this court. In answer to the complaint, Lehrer, the attorney for the defendant, asserted a counterclaim against not only the plaintiff but Thomason and his law firm as well. As a result of this counterclaim, Thomason withdrew from his representation of the plaintiff in that suit. However, Thomason considered the counterclaim a personal and professional affront, and, consequently, he filed a claim against Lehrer in state court based on that counterclaim. Thomason charged Lehrer with a federal civil rights abuse of process under 42 U.S.C. § 1983, and other state law tort claims, alleging that "by filing the counterclaims in this Court, Lehrer had violated Thomason's civil rights, negligently misrepresented that Thomason had a 'financial interest in [the plaintiff's company]' and tortiously interfered with Thomason's 'reasonable expectation of prospective work and fee income from acting as attorney [for the plaintiff].'" *Thomason,* 183 F.R.D. at 163. Lehrer removed the action to the federal court, and the case appeared before the same trial judge who had heard the original claim. The court unequivocally rejected Thomason's claim, stating:

> Thomason steadfastly and vehemently defends his belief that it is appropriate for an attorney, aggrieved by the tactics of an adversary in a federal court action, to file a state court complaint against his attorney-adversary in an effort to obtain redress for the alleged abuses.... To hail an attorney-adversary into state court to answer for conduct arising out of a federal court proceeding subverts a District Court's ability to execute its duty to supervise the conduct of the

members of its bar.... Furthermore, it results in needless "satellite litigation" and burdens state courts with litigation that properly belongs in federal courts. *Id.* at 169.

 Notwithstanding the various tools available to this court to control litigation, litigants and attorneys, this court can see no basis upon which to control Ford's contact with state prosecutorial agents related to the institution of a criminal charge. The court would clearly have authority to sanction Ford, its attorneys or other agents for any discovery-related contact they may have had with state law enforcement authorities, and the court extends the privilege to any such contact by Ford. Yet, it is not this conduct for which the plaintiff seeks a remedy. Rather, the plaintiff has sued Ford, and Ford alone, for its contact with state law enforcement authorities related to the institution of a separate criminal investigation against Dr. Thomas. Ford has no independent power over the state law enforcement authorities to require them to *commence* such an investigation. And, in fact, it is this court's understanding that no such criminal investigation has been instituted. (*See* Letter of J. David Meyer, Acting First Assistant Prosecutor, County of Cape May, dated May 2, 2000, attached as Ex. I to Ps' Brief (stating that no investigation file was open)). Nor could counsel for Ford identify any such power. Rather, Ford's counsel considers such contact "a direct obligation" required by state law, N.J.S.A. 2C:29–3. (Transcript of July 18, 2000, at 49; D's Brief at 26 n. 11). Indeed, to find that such power exists would threaten the carefully erected constitutional barrier between state and federal authority.

Despite the lack of direct control, Defendant Ford urges this court to apply the absolute privilege relying upon the Appellate Division decisions of *DeVivo v. Ascher,* 228 N.J.Super. 453, 550 A.2d 163 (App.Div. 1988), and *Ruperton v. Gabage,* 280 N.J.Super. 125, 654 A.2d 1002 (App.Div. 1995). Neither case alters the court's de-

termination. *DeVivo,* a pre-*Hawkins* case, explicitly declined to decide the impact of control, as control was present. And in Ruperton, also a pre-*Hawkins* case, the court explicitly found that court control was present. 280 N.J.Super. at 134, 654 A.2d 1002 ("Of course, counsel's comments are subject to 'the comprehensive control exercised' by the trial judge." (quoting *Rainier's Dairies,* 19 N.J. at 562, 117 A.2d 889)).

Instead, this court finds instructive *Geyer v. Faiella,* 279 N.J.Super. 386, 652 A.2d 1245 (App.Div.1995). In *Geyer,* the court was faced with Geyer's claim that "Faiella had concocted a false story that Geyer had threatened his life; related it to [Geyer's attorney] orally and in writing; and that [Geyer's attorney], aware of its falsity, republished the 'lie' to the United States Attorney's Office." 279 N.J.Super. at 388, 652 A.2d 1245. The trial court dismissed the defamation count as barred by the absolute litigation privilege. *Id.* 389–90, 652 A.2d 1245. The Appellate Division reversed. The Appellate Division recognized the necessity of court control over the conduct, and found that "[s]uch mitigating factors are not present at the stage of making an initial complaint to prosecutorial or law enforcement authorities." *Id.* at 391, 652 A.2d 1245. Noting that prosecutors enjoy only a qualified privilege at the complaint stage of a criminal proceeding, the court held:

> [W]e find no compelling policy interest in affording to untruthful criminal complainants an absolute privilege while affording to the prosecutors who receive and act upon such untruthful complaints only a qualified privilege.
>
> We conclude that each defendant's privilege in this instance was qualified, not absolute, and thus not privileged if the person making it had full knowledge of its untruthfulness.

*Id.* at 392, 652 A.2d 1245.

Dr. Thomas has charged Ford with fabricating evidence and presenting that evi-

dence to state law enforcement authorities. This is precisely the conduct at issue in *Geyer.* Consequently, the court finds that although no absolute privilege exists, a qualified privilege may be appropriate to the plaintiff's claims of defamation and intentional infliction of emotional distress. Because determination of a qualified privilege necessarily requires weighing of evidence related to the presence or absence of malice on Ford's part, *Erickson,* 117 N.J. at 564, 569 A.2d 793, the court shall permit the amendment, and allow discovery to proceed on these claims. *See Cappello v. Scott,* 274 N.J.Super. 282, 644 A.2d 102 (1994) (finding that it is premature to decide application of a qualified privilege prior to completion of discovery). At the close of discovery, Ford may renew its motion should it see fit.

### IV. Conclusion

For the foregoing reasons, the court shall deny the plaintiffs' motion to add a claim for civil rights conspiracy under 42 U.S.C. § 1985(2) and grant Dr. Thomas's request to add claims for defamation and intentional infliction of emotional distress.

The attached order shall be entered.

### ORDER

This matter having been brought before this court upon the motion of James H. Pickering, Jr., Esquire, counsel for the plaintiffs, to supplement the complaint pursuant to Fed.R.Civ.P. 15(d); and the court having considered the submissions of the parties; and the court having further considered the oral argument conducted on the record on July 18, 2000; and for the reasons noted in the opinion entered on this date; and for good cause shown;

IT IS on this *31st* day of August 2000 hereby

**ORDERED** that the plaintiffs' motion to supplement the complaint pursuant to Fed. R.Civ.P. 26(c) shall be **granted in part and denied in part;** and

IT IS FURTHER **ORDERED** that the plaintiffs shall file their supplemental complaint, in conformance with the opinion issued on this date, no later than *September 15, 2000;* and

IT IS FURTHER **ORDERED** that the defendants shall file an answer to the complaint no later than *October 6, 2000.*